**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JAMES P. REGAN** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CASE NO. 1:08-cv-00697** |
| | | **Judge Royce C. Lamberth** |
| **LEX, INC.** | * | |
| **Defendant** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, LEX, Inc. ("LEX"), by counsel, moves this Court, pursuant to Fed. R. Civ. P. 56, to enter summary judgment in its favor and against Plaintiff. The material facts are undisputed and LEX is entitled to judgment as a matter of law on Plaintiff's claims under the Fair Labor Standards Act, the District of Columbia Wage and Hour Statute, breach of contract, the District of Columbia Wage Payment Statute, and the Maryland Wage Payment Statute. Plaintiff cannot establish violations of any of the statutes referenced above nor can he establish that LEX breached any contract.

In support of this Motion, the Court's attention is respectfully invited to view the Memorandum of Points and Authorities in Support of LEX's Motion for Summary Judgment and supporting exhibits, all filed contemporaneously herewith and incorporated by reference herein.

WHEREFORE, Defendant LEX, Inc. respectfully requests that summary judgment be awarded in favor of LEX and against Plaintiff. LEX further requests that the Court award LEX its costs and attorneys' fees, and such further relief as the Court deems appropriate.

Respectfully submitted,

_____/s/_____

Francis R. Laws (Bar No. 2596)
Thomas & Libowitz, P.A.
100 Light Street, Suite 1100
Baltimore, MD 21202-1053
(410) 752-2468
Fax: (410) 752-0979

Attorney for Defendant
LEX, Inc.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 18th day of June 2008, a copy of the foregoing

Defendant's Motion for Summary Judgment, supporting Memorandum of Law, and proposed Order

was served, via email on John J. Rigby, Esquire, McInroy & Rigby, L.L.P., 2200 Wilson Blvd.,

Suite 800, Arlington, Virginia 22201, Attorney for Plaintiff.

_____/s/_____

Francis R. Laws

2

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **JAMES P. REGAN** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CASE NO. 1:08-cv-00697** |
| | | **Judge Royce C. Lamberth** |
| **LEX, INC.** | * | |
| **Defendant** | * | |

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

## DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Francis R. Laws (Bar No. 2596)
Thomas & Libowitz, P.A.
100 Light Street, Suite 1100
Baltimore, MD 21202-1053
(410) 752-2468
Fax: (410) 752-0979

Attorney for Defendant
LEX, Inc.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| JAMES P. REGAN | * | |
| Plaintiff | * | |
| v. | * | CASE NO. 1:08-cv-00697 |
| | | Judge Royce C. Lamberth |
| LEX, INC. | * | |
| Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

## I.      INTRODUCTION

Defendant, LEX, Inc. ("LEX") respectfully moves for summary with respect to Counts I through V of Plaintiff's six count Complaint. Plaintiff James P. Regan ("Regan") claims that LEX, his former employer, violated the Fair Labor Standards Act ("FLSA") (Count I), and the District of Columbia Wage Hour Statute ("DC Wage Statute") (Count II), by failing to pay him overtime for hours actually worked in excess of forty (40) per work week. Regan further avers that LEX failed to pay him commissions to which he was due, constituting a breach of contract (Count III), violation of the District of Columbia Wage Payment Statute (Count IV), and violation of the Maryland Wage Payment Statute (Count V).[1]

The Complaint is fatally flawed as a matter of law on several grounds. First, with regard to the alleged overtime violations in Counts I and II, Regan was exempt from the overtime provisions of the FLSA and DC Wage Statute as an "outside salesman". Likewise, Regan's

---

[1] Count VI of the six count Complaint seeks a declaratory judgment concerning a covenant not to compete contained in Regan's employment agreement with LEX. This Memorandum and the related Motion for Summary Judgment do not address Count VI.

claims in Counts III, IV, and V that he earned commissions he was not paid are baseless; he has been paid everything he earned.

For the foregoing reasons, as more fully set forth below, LEX, by its undersigned counsel, moves for judgment as a matter of law with respect to Counts I, II, III, IV, and V of the Complaint.

## II.    FACTS

On or about August 2, 2002, Regan entered into an employment contract with LEX. Compl. ¶ 19 and Ex. 2 thereto. At that time, Regan held the position and performed the duties of Account Manager for LEX. The Complaint fails to mention that this initial contract was superseded when he ascended to the position of Sales Consultant, on or about March 7, 2003. At that time, Regan executed a subsequent employment contract (the "Employment Agreement"). See Ex. 1, Regan Employment Agreement. Regan remained employed with LEX as Sales Consultant, pursuant to the terms of the Employment Agreement, until his resignation on June 13, 2007. Affidavit of K. Hughes, Ex. 2.

Pursuant to the terms of the Employment Agreement, Regan was to be paid $3,000.00 per month for the first six months; i.e., until September 2003. Following the expiration of this initial six month term, Regan was paid entirely on a commission basis. Ex. 1; K. Hughes Affidavit, Ex. 2.

After Regan left LEX, he contacted the Company complaining that he thought he had been paid less than he earned under the Company's commission structure. With his counsel, an attorney other than the one currently representing him in this lawsuit, Regan came to LEX to go through his commission payments. Regan was unable to identify any shortfalls in what he was paid. K. Hughes Affidavit, Ex. 2.

As the result of the allegations in this lawsuit, LEX undertook further analysis of Regan's commission payments. Regan was paid everything to which he was entitled. K. Hughes Affidavit, Ex. 2.

As Sales Consultant, Regan was required to and did spend most of his time out of the office. LEX provides litigation support to law firms, offering a wide range of services including collections, forensics, electronic data discovery, paper discovery, data analysis, online hosting and review, and evidence preparation and consulting services.[2] Regan's duties as Sales Consultant included, but were not limited to, sales visits to existing and prospective customers; marketing, advertising, and promotional efforts; estimating and bidding of jobs; and resolving customer complaints. His clients had cell phone access to him twenty-four (24) hours a day, and Regan had the authority to set his own schedule based upon his clients' needs. Anderson Affidavit, Ex. 3. Regan's sales territory included Washington D.C.; Arlington, Fairfax, Loudon, and Prince William Counties, Virginia; the City of Alexandria, Virginia; and Montgomery, Prince George's, Howard, and Charles Counties, Maryland, with a primary focus on Washington, D.C. Anderson Affidavit, Ex. 3.

## III.    STANDARDS

Pursuant to Federal Rule of Civil Procedure 56, Regan must demonstrate that there are specific material facts in dispute that create a genuine issue for trial. Chelates Corp. v. Citrate, 477 U.S. 317, 324 (1985). There must be sufficient evidence so that reasonable jurors could find that Regan has proved his claim by a preponderance of the evidence. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Regan must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio

---

[2] LEX's web site contains a much more detailed explanation of the services the Company offers. See http://www.lexondemand.com/about.aspx. Most of the services the Company provides involve the reproduction of information, which the Company lumps within the description "copy services."

Corp., 475 U.S. 574, 586 (1986). Thus, Regan must demonstrate that there is sufficient evidence

from which a reasonable jury could determine that LEX violated the federal and state statutes

cited in the Complaint and that LEX breached the contract referenced in the Complaint.

## IV.    ARGUMENT

### A.    REGAN'S OVERTIME CLAIMS FAIL AS REGAN IS EXEMPT AS AN OUTSIDE SALESMAN.

Regan cannot prevail on the overtime claims asserted in Counts I and II because the

minimum wage and overtime provisions do not apply to him since he is an "outside salesman."

29 U.S.C. § 213(a)(1) and D.C. Code Ann. § 13-1004(a)(1).[3]  The Code of Federal Regulations,

29 C.F.R. § 541.500, defines "outside salesman" as:

> a) The term "employee employed in the capacity of outside salesman" in section
> 13(a)(1) of the Act shall mean any employee:
>
> (1) Whose primary duty is:
>
> (i) making sales within the meaning of section 3(k) of the Act, or
>
> (ii) obtaining orders or contracts for services or for the use of facilities for which
> a consideration will be paid by the client or customer; and
>
> (2) Who is customarily and regularly engaged away from the employer's place or
> places of business in performing such primary duty.
>
> (b) The term "primary duty" is defined at § 541.700. In determining the primary
> duty of an outside sales employee, work performed incidental to and in
> conjunction with the employee's own outside sales or solicitations, including
> incidental deliveries and collections, shall be regarded as exempt outside sales
> work. Other work that furthers the employee's sales efforts also shall be regarded
> as exempt work including, for example, writing sales reports, updating or revising
> the employee's sales or display catalogue, planning itineraries and attending
> sales conferences.

---

[3] The FLSA and the D. C. Wage Statute, with respect to overtime exemptions, are construed in *pari materia*.  See
Jones and Associates, Inc. v. District of Columbia, 642 A.2d 130, 134 (D.C. 1994) (holding that where a D.C.
enactment specifically refers to a federal statute and to the regulations promulgated pursuant to it, decisions of the
federal courts construing the federal statute and regulations are especially persuasive authority).

Pursuant to 29 U.S.C. § 213(a)(1), individuals employed in the capacity of "outside salesmen" are exempt from minimum wage and overtime pay requirements. In order to qualify for the exemption, an employee must (1) be engaged in either making sales within the meaning of § 3(k) of the FSLA or obtaining orders or contracts for services or contracts for the use of facilities;[4] (2) be customarily and regularly engaged "away from his employer's place or places of business;" and (3) any nonexempt work performed by the salesperson does not exceed twenty percent (20%) of the hours worked each week by the employee.[5]

Regan clearly qualifies for the outside salesman exemption. First, he was engaged in the type of work exempted under the act, as his job primarily consisted of obtaining contracts for services to be performed for customers by someone other than Regan.[6] As his contract states, Regan's primary duties as a sales consultant included soliciting new business, visiting existing customers, and delivering the product to the customers. As a sales consultant, Regan had daily contact with customers for which he was responsible. Through such customer contact, Regan developed personal relationships with persons who had purchasing responsibilities within the law firms with which they dealt. These personal customer contacts are essential to LEX's business as it is these personal relationships that LEX relies on and needs to retain in order to maintain its business. Generally, corporations and law firms have designated persons within the firm that are responsible for purchasing and determining copying services. Thus, these personal customer contacts are even more crucial in LEX's particular business as in every organization there are a limited number of potential clients. Anderson Affidavit, Ex. 3.

---

[4] § 3(k) of the FSLA defines "sale" to include any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition."  29 U.S.C. § 203(k).
[5] 29 C.F.R. § 541.507.
[6] 29 C.F.R. §541.501(d).

Second, Regan traveled from one location to the next in order to make sales. Regan was required to, and did, spend more than fifty percent of his time outside the office employed in the above endeavors. Moreover, any work performed by Regan that is incidental to and in conjunction with his outside sales is also exempt.[7] To the extent he spent time in the office, said efforts were in support of his outside sales activities. For instance, he was required to attend sales meetings within the office, complete the paperwork necessary to record and process the sales he made, monitor the progress of the work sold, and handle customer inquiries pertaining to the work sold. Id.

Third, Regan performed a minimal amount of nonexempt work, which further proves that Regan qualifies as an outside salesman. The only type of work performed by Regan that may be considered nonexempt is work that is not incidental to making sales, and even if Regan did perform work which could be considered nonexempt, the amount of such work is minimal and significantly less than twenty percent (20%) of the hours worked each week by him. Id.

With respect to judicial interpretation of the outside salesman legislation, it has been held that, among the factors considered in determining whether an employee was an "outside salesman," and thus exempt from minimum wage and overtime requirements, are whether the employee (1) must solicit new business; (2) receives sales training; and (3) was hired and denominated as a salesman.[8] With respect to the third aforementioned factor, it has been held that a contractual designation of certain employees as "salesmen" lends a great deal of support to the inclusion of such employees within the outside salesmen exemption.[9] Upon examining such factors, it becomes apparent that Regan qualified for the outside sales exemption. Regan's job

---

[7] 29 C.F.R. §541.500 (b); Green v. Terminex Int'l, 649 F. Supp. 243, 244 (M.D. Fla. 1986) (demonstrations and inspections performed with regard to pet control services were incidental to sales work).
[8] Fields v. AOL Time Warner, Inc., 261 F. Supp. 2d 971 (W.D. Tenn. 2003).
[9] Jewel Tea Co. v. Williams, 118 F.2d 202 (10th Cir. 1941).

consisted of soliciting new business; he received sales training; and, what's more, Regan was clearly hired and denominated as a salesman.

Furthermore, courts have held that the fact that an employee received little or no direct or constant supervision in carrying out his daily work tasks or setting his schedule supports the view that an employee qualifies as an outside salesman.[10]  Regan set his own hours without the input of a supervisor.  In order to be most effective, Regan primarily needed to work between the hours of 9:00 a.m. and 5:00 p.m. because that was when his clients' businesses generally operated.  However, Regan always carried a cell phone and was available twenty-four (24) hours per day in case his clients needed to contact him.  Id.  Thus, Regan determined his work schedule based upon his clients' needs, and Regan did not receive direct supervision with respect to decisions concerning which clients to pursue, appease, and serve and when to do so.

Ultimately, outside salesmen have been characterized as employees who, like Regan did, work individually with no restriction on their hours and who can, within the range of their abilities, earn as much or as little as ambition dictates; since, instead of overtime, they ordinarily receive commissions or similar extra compensation.[11]  Through this line of reasoning, courts have viewed significant commission compensation as indicia of sales-related activities so as to qualify for inclusion within the outside salesman exemption.[12]  After all, the individual character of employment is the primary reason why outside salesmen are exempted from minimum wage

---

[10] Hodgson v. Krispy Kreme Doughnut Co., 346 F. Supp. 1102 (D.C. N.C. 1972) (route salesman qualified as outside salesman because he determined his own starting time, pattern of work calls, and number of hours); Hodgson v. Greene's Propane Gas Service, Inc., 479 F.2d 1027 (D. Ga. 1971) (certain route drivers qualified as outside salesmen because they determined their own working hours away from their employer's place of business and independent of his personal supervision); Bradford v. Gaylord Products, Inc., 77 F. Supp. 1002 (D.C. Ill. 1948) (cosmetic technician and sales demonstrator arranged her own hours for demonstrations in aid of obtaining sales orders and this supported the conclusion that she qualified as an outside salesman).
[11] Jewel Tea Co., supra.
[12] Hodgson v. Krispy Kreme Doughnut Co. (route salesman qualified as outside salesman because he received, solely or in a large part, commission compensation based on net sales.).

and overtime requirements.[13]   Therefore, Regan was the exact type of employee the outside salesman exemption intends to encompass.   After all, Regan had complete autonomy with respect to which clients he solicited and maintained, his hours were flexible, and the amount of compensation he received was entirely dependent upon how much or how little he chose to work and how well he performed based upon his ability as a salesman.

Regan unquestionably was an exempt employee under §13(a) of the Fair Labor Standards Act and §13-1004 of the D. C. Act.  Accordingly, summary judgment should be granted on this basis alone.

### B.    REGAN'S BREACH OF CONTRACT AND VIOLATION OF DISTRICT OF COLUMBIA AND MARYLAND WAGE PAYMENT STATUTES CLAIMS MUST FAIL BECAUSE REGAN CANNOT PROVE THAT LEX FAILED TO PAY WAGES OWED.

In Counts III, IV, and V Regan maintains that "Defendant LEX failed to compensate Mr. Regan as agreed by, without limitation, failing to pay Mr. Regan all commissions that were due him." Compl. ¶16.  He does not, and he cannot, articulate just how he arrives at this conclusion.

Regan made this claim shortly after he left LEX.  LEX invited him to the office, with his counsel, to go through his sales and contrast his paychecks with earned commissions.  He was unable then to articulate any discrepancies.  When this lawsuit was filed, LEX undertook another audit of his income.  That audit revealed that he did, in fact, receive everything to which he was entitled. K. Hughes Affidavit, Ex. 2.

Regan's Complaint is noteworthy in its lack of detail on this point.  He makes no effort to describe how he was compensated, how his commission was calculated, what business he wrote that was not included in his commission payments, or even which pay periods he was allegedly shorted.  This is hardly surprising since he attached a superseded, irrelevant former contract to

---

[13] Hodgson v. Greene's Propane Gas Service, Inc., supra.

his Complaint as evidence of his claims. In this case, Regan has only his own self-serving, unsupported claims, and it has been held that "[s]ummary judgment for defendant is most likely when plaintiff's claim is supported solely by plaintiff's own self-serving, conclusory statements."[14] Thus, Regan's self-serving assertions obviously do not meet his burden of being able to present evidence that he was paid less than what he earned. Accordingly, summary judgment should be granted on this basis as well.

## V.    **CONCLUSION**

For all the foregoing reasons, Defendant LEX, Inc. respectfully requests that its Partial Motion for Summary Judgment be granted, and that summary judgment be granted with respect to Count I (violation of the FLSA), Count II (violation of the District of Columbia Wage Hour Statute), Count III (breach of contract), Count IV (violation of the District of Columbia Wage Payment Statute), and Count V (violation of the Maryland Wage Payment Statute).

Respectfully submitted,


_____/s/_____
Francis R. Laws (Bar No. 2596)
THOMAS & LIBOWITZ, P.A.
100 Light Street, Suite 1100
Baltimore, Maryland 21202-1053
(410) 752-2468
Fax: (410) 752-0979

Attorney for Defendant
LEX, Inc.

---

[14] Bonieskie v. Mukasey, 540 F. Supp.2d 190, 195 (D.D.C. 2008).

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), made as of March 1, 2003, by and between Lex, Inc., a Delaware corporation with its principal office at 1225 New York Avenue, N.W., Washington, D.C. 20005 (the "Company") and Jamie Regan, an individual residing at ___952 Towlston Road McLean Va 22102___ (the "Employee").

1.  <u>Definitions</u>.

    a.    Customer or account, as used herein, shall mean the business entity with whom the Company transacts business.

    b.    Customer contact or account contact, as used herein, shall mean the individual representative, employee, partner, principle, or agent of a customer or account with whom Employee interacts in transacting business or soliciting business.

    c.    Contact or communication, as used herein, shall mean intercourse of any kind between the Employee and another individual(s), whether, verbal, written, or otherwise, for the purpose of providing copy services or the solicitation of copy services.

    d.    Assigned Territory, as used herein, shall mean the Washington, DC Metropolitan Area, including the District of Columbia and Arlington, Fairfax, Loudon and Prince William Counties and the City of Alexandria, Virginia and Montgomery, Prince Georges, Howard and Charles Counties, Maryland.

2.  <u>Employment</u>.  The Company, which includes all subsidiaries and affiliates, employs the Employee and the Employee accepts employment upon the terms and conditions of this Agreement.  If the Employee is promoted, demoted, transferred, or re-assigned to another position, this Agreement survives that employment action.

3.  <u>Term</u>.  This Agreement shall be terminable at the will of each party.  Employee shall provide fourteen (14) days advance written notice to the Company when employee desires to terminate the employment relationship.  Employee shall be entitled to compensation only for such time as Employee provides full-time and exclusive services to the Company, as described herein.  If Employee elects to terminate employment, the Company, at its option, may immediately terminate Employee's employment without allowing for the additional fourteen (14) days to elapse.

-1-

4.    Compensation.  In consideration of the services to be rendered by the Employee under this Agreement, the Company shall pay the Employee the amount set forth in Exhibit A attached hereto and made a part hereof.  Such compensation shall be subject to withholding and other applicable taxes.  Employee's compensation may be increased or decreased by the Company, at the sole discretion of the Company.

5.    Duties.  The Company shall employ the Employee as a Sales Consultant. Employee shall comply with the obligations set forth in this Agreement and with Company policy, whether or not reduced to writing, to the extent Company policy is not inconsistent with the terms of this Agreement.  Employee's primary duty shall be to assist the Company in becoming the best, most successful, copy services provider in the Employee's Assigned Territory.  Employee's duties therefore include all tasks, assignments, and activities in furtherance of the primary duty.  Employee will be responsible for, among other things, developing a sales and marketing plan for the assigned territory; soliciting new business with existing customers; soliciting new business from new customers; making sales calls and visits to existing customers and prospective new customers; coordinating job pick-ups and deliveries with Account Managers; performing job pick-ups and deliveries when necessary; resolving customer complaints; assisting all Company employees in providing the highest level of customer service; and all other duties required by the Company.  It is expressly understood that Employee's communications with any customer contact, including partners, principles, employees, agents, and representatives of any account, have as their ultimate purpose or goal the solicitation and/or servicing of all of the copy service business of that account for the Company in furtherance of Employee's duties hereunder.

6.    Duty of Loyalty.  The Employee shall devote his or her entire time, energy and attention to the Employer's business.  During the term of employment, Employee agrees not to engage in any other business activity, regardless of whether it is pursued for gain or profit.  Employee further agrees not to pursue or be connected with any business which is in competition with the Company or its affiliates or subsidiaries during the term of employment.

7.    Sales Subject to Acceptance.  All sales made by Employee shall be made subject to acceptance by the Company, and all contracts for the Company's services shall be executed by a duly authorized officer of the Company.   No credit or other financial decisions relating to the Company's sales or business shall be made by Employee.

8.    Probationary Period.  All new employees are hired on a ninety (90) day probationary basis.  The Company may, however, extend the probationary period up to an

additional ninety (90) days. Employee will be informed if the probationary period is to extend beyond the first ninety (90) days. In addition, the probationary period will be extended by the number of days Employee is absent from scheduled work while in a probationary status. Employee may choose to resign, or may be terminated by the Company, without notice at any time during the probationary period. Upon termination, a probationary employee will be paid the pay earned to the date of termination. An employee who successfully completes the probationary period is entitled to the benefits of a regular (non-probationary) employee. However, employment is terminable by either the Company or Employee at any time, at will, both before and after the probationary period. Employee will not be paid for absences that occur during the probationary period or the extended probationary period.

9.    Representations and Warranties. Employee represents and warrants that he or she is not a party to any agreement with any third party containing a non-competition provision or other restriction that would preclude any part or all of Employee's employment with the Company or any of the services which Employee will provide to the Company. Moreover, Employee represents and warrants that he or she is not limited by any court order or other obligation from performing all assigned duties for the Company. Employee understands that this is a condition precedent to any employment offered by the Company and that Employee agrees herein that he or she will indemnify and hold harmless the Company for any legal action taken against the Company as the result of any agreement with a prior employer, including reimbursing the Company for any legal expenses incurred in defending such action.

10.   Covenant Not to Compete.

a.    The Company undertakes to train and to continue to train Employee and to impart to Employee confidential information and knowledge about the Company's business strategies and policies, accounts, customer lists, trade secrets, procedures, and methods. The Company has established a valuable and extensive business in its service, which business has been developed at a considerable expense to the Company. The nature of the business is such that the customer relationships and goodwill that the Company has developed must be maintained through close personal contact of its Employees with the contact person(s) at the particular account or customer.

b.    By virtue of Employee's employment with the Company, Employee will become familiar with and have access to the manner, methods, trade secrets, and confidential information pertaining to the Company's business, and with the names and lists of customers and customer contacts. During Employee's employment with the Company, Employee is being compensated in part for developing and maintaining

-3-

relationships and good will with customers, prospective customers, customer contacts, and prospective customer contacts of the Company. It is understood that Employee will become personally acquainted with the Company's customers, their business requirements, the amount paid by them for the Company's services, and the contact persons at the particular account or customer.

c.     For a period of two (2) years after the termination of employment, whether with or without cause, whether voluntary or involuntary, the Employee shall not, either directly or indirectly, on Employee's own behalf or in the service of or on behalf of others, (i) engage in any competing business activity within the Employee's assigned territory; or (ii) contact, cause to be contacted, or communicate with any specific accounts or customers for which Employee was responsible or whom Employee had contact during his or her employment with the Company. Such contact is prohibited only to the extent that it is adverse to the interests of the Company or would benefit or potentially benefit any competitor or potential competitor of the Company, and further, nothing contained herein shall prevent Employee from engaging in any activity that is not competitive with the business then being conducted by the Company. Employee understands and agrees that the Company has a legally protectable interest in the relationships and good will it has developed with its customers through Employee and other employees, in the relationships and good will it has developed with individual contact persons at each of its customers, in its customers themselves and its business with them, including that business which the Employee developed or for which the Employee had responsibility.

d.     In the event of a breach of any provision of Section 10 by Employee, Employee agrees that the Company shall be entitled to an injunction prohibiting conduct in breach of this Agreement. Employee acknowledges and agrees that a breach of Section 10 will result in immediate, actual, irreparable injury to the Company. Employee further acknowledges and agrees that it is impossible to determine with any reasonable accuracy the financial injury that could and/or would result by actions in breach of Section 10.

e.     It is understood and agreed that part of the consideration for Employee's employment and/or continued employment with the Company is this Agreement not to compete. It is also understood and agreed that one goal of the period of non-competition is to allow the Company to re-establish the personal relationships with customers and customer contacts developed and/or nurtured by Employee during his or her employment with the Company. In the event of a breach of Section 10 by the Employee, the Company shall be entitled to liquidated damages as defined herein. For each customer or account of the Company that Employee contacts, causes to be contacted, or otherwise works with or for in violation of this Section 10, Employee shall pay to the Company liquidated damages in the amount of the average monthly billing by the

-4-

Company to that customer or account times the number of months remaining in Employee's Covenant Not to Compete, to be determined from the date of the initial contact made by the Employee to that customer or account. The average monthly billing shall be the average billing to that customer or account by the Company's office where Employee worked during the twelve (12) months preceding Employee's termination. The parties agree that it is impossible to ascertain with any reasonable accuracy the amount of prospective damages to the Company resulting from a breach by the Employee of this Section 10, which damages would include business lost to the Company for a period of time well beyond the two year term specified in this Section 10. The parties further agree that the damages set forth above are reasonable, and not a penalty, based upon a conservative estimate of the value, or a portion of the value, of the loss of the customer or account in question, in addition to a loss of good will.

11. <u>Non-Solicitation of Employees.</u>

a. For a period of two (2) years after the termination of employment, whether with or without cause, whether voluntary or involuntary, the Employee shall not, either directly or indirectly, on Employee's own behalf or in the service of or on behalf of others, solicit, divert, recruit or employ any employee of the Company, including any of its subsidiaries or affiliates.

b. In the event of a breach of this Section 11 by the Employee, the Company shall be entitled to liquidated damages as defined herein. For each former employee of the Company solicited, diverted, recruited, or employed or caused to be in violation of this Section 11, Employee shall pay the Company liquidated damages for each account or customer of the Company which such former employee handled for the Company during the two (2) years immediately preceding termination of that former employee and which customer or account the former employee contacts or otherwise services or works with for the benefit of Employee or anyone in privity with Employee. The liquidated damages for each such account or customer shall be (i) the amount of billings by the Company to the customer or account during the twelve (12) months immediately preceding termination of such former employee with the Company, and (ii) the amount of the first six (6) months' salary paid to the replacement(s) for the former employee. If the former employee was not in a position to have accounts, Employee shall pay the Company the amount of the first six (6) months' salary paid to the replacement(s) for the former employee.

c. The parties agree that it is impossible to ascertain with any reasonable accuracy the amount of prospective damages to the Company resulting from a breach by the Employee of this Section 11. The loss of an employee creates a hardship

and burden on the Company, for which the Company suffers substantial harm. The Company must expend funds to search for a replacement employee and train that employee. Further, the loss of the overall efficiency of the office as the result of an employee leaving cannot be quantified. Consequently, the parties agree that the liquidated damages set forth above are reasonable, and not a penalty, based upon a conservative estimate of the value, or a portion of the value, of the former employee to the Company.

        d.    In the event of a breach of any provision of Section 11 by Employee, Employee agrees that the Company shall be entitled to an injunction prohibiting conduct in breach of this Agreement. Employee acknowledges and agrees that a breach of Section 11 will result in immediate, actual, irreparable injury to the Company. Employee further acknowledges and agrees that it is impossible to determine with any reasonable accuracy the financial injury that could and/or would result by actions in breach of Section 11.

12.    <u>Non-Disclosure of Confidential Information.</u>

        a.    The Company is committed to preserving and protecting confidential and proprietary information and trade secrets (collectively "Confidential Information") to the full extent permitted by law. During the term of employment, Employee will have access to and become familiar with such Confidential Information of the Company. All confidential information is the exclusive property of the Company. Confidential Information includes, but is not limited to, devices, secret inventions, processes and compilations of information, records, specifications, customer lists, price lists, customer proposals, advertising and marketing plans, business plans, all computer information designed by or developed for the Company, or any confidential knowledge or secrets with respect to the business of the Company.

        b.    In consideration of employment, Employee acknowledges an obligation not to disclose Confidential Information to any third party, directly or indirectly, or use Confidential Information in any way that is adverse to the Company, either during or for a period of five (5) years after the term of employment. Use of Confidential Information during the term of employment is restricted to that use necessary for the performance of Employee's duties.

        c.    Upon termination of employment, Employee shall return to the Company all Confidential Information, including, but not limited to, data, records, customer and product lists, notes, correspondence, or any other documents or copies thereof, which came into Employee's possession and are related to the Company's business.

13.    <u>Injunctive Relief</u>. To the extent permissible by law, the Company shall be entitled to injunctive or other equitable relief in the event of a breach or threatened breach by Employee of any of the covenants contained in this Agreement.

14.    <u>Waiver of Breach</u>. The failure of either party to this Agreement to insist upon the performance of any of the terms and conditions of this Agreement, or the waiver of any breach of any of the terms and conditions of this Agreement, shall not be construed as thereafter waiving any such terms and conditions, but the same shall continue and remain in full force and effect as if no such forbearance or waiver had occurred.

15.    <u>No Assignment</u>. This Agreement and the rights, interests and benefits hereunder shall not be assigned, transferred, pledged, or hypothecated in any way by Employee or any executor, administrator, heir, legatee, distributee, or other person claiming under Employee and shall not be subject to execution, attachment, or similar process. Any attempt by Employee to assign, transfer, pledge, or hypothecate or otherwise dispose of this Agreement or such rights, interest and benefits, or the levy of any attachment or similar process thereupon shall be null and void and shall relieve the Company of any and all liability hereunder.

16.    <u>Attorney's Fees</u>. If the Employee makes a claim against the Company associated in any way with his employment at the Company and the Company prevails, in whole or in part, on that claim, or if the Company succeeds in whole or in part in a claim against Employee for breach of this Agreement, the Company is entitled to recover reasonable attorney's fees and other litigation costs, including costs associated with retaining the services of expert witnesses.

17.    <u>Severability and Reformation</u>. If any provision of this Agreement is held invalid by a court of competent jurisdiction, such holding will not invalidate any of the other provisions herein, as it is intended that the provisions of this Agreement shall be severable and that the invalidity of one shall not invalidate the others. Notwithstanding the foregoing, if it should ever be held that any provision contained herein does not contain reasonable limitations as to time, geographical area, or scope of activity to be restrained, then the court so holding shall, at the request of the Company, reform such provisions to the extent necessary to cause them to contain reasonable limitations as to time, geographical area and scope of activity to be restrained and to give maximum permissible effect to the intentions of the parties as set forth herein, and the court shall enforce such provisions as reformed.

18.    <u>Governing Law</u>. It is agreed by the parties that the law of the State of

Maryland will govern the interpretation, validity, and effect of this Agreement.

19.    Counterparts. This Agreement may be executed in multiple counterparts, and by the parties by separate counterpart, each of which shall be deemed an original and all of which together shall constitute one instrument.

20.    Entire Agreement. This Agreement supercedes any prior Agreements between the Employee and the Company, as well as any other statements or representations of any kind. Employee and the Company hereby agree that this Agreement constitutes the entire agreement between the parties with respect to Employee's employment with the Company. No changes or amendments to this Agreement shall be effective unless in writing and signed by both parties. This Agreement shall bind the parties, their successors and assigns.

IN WITNESS WHEREOF, the parties have affixed their signatures to this Agreement to be effective on the day and year first written above.

LEX, INC.                                     EMPLOYEE

By: _Chuck P_____                            _____

Name: _CHUCK PINDEll_                         Name: _JAMES P. REGAN_

Date: _3-1-03_                                Date: _3-07-03_

-8-

EXHIBIT "A"

LEX Reprographics is pleased to offer you the position of Sales Consultant. This is a full-time position with a starting salary of $36,000 per annum for the first 6 months, and 100% commission with a $2,000 monthly draw against commission thereafter. In addition to any salary, a commission of 10% of revenue sold will be paid according to the schedule listed below. The salary will be paid twice per month and any commission will be paid once per month. All compensation will be paid according to LEX Reprographics' current pay schedule.

| Time Period | Salary | Commission |
| --- | --- | --- |
| Month 1 thru 6 | $3,000/month | 10% of revenue sold over $30,000 |
| Month 7 forward | $0 | 10% of revenue sold over $1 |

LEX, INC.                                EMPLOYEE

By: ___CarterR_____             _____

Name: __Chuck Pudell___               Name: ___James P. Regan____

Date: __3-1-03_____                  Date: ___3-07-03_____

-9-

LEX Policy Manual

Section Number:

Regarding:  STANDARD CONSULTANT COMPENSATION PLAN

Forms needed: none

The purpose of this policy is to outline the standard compensation plan for a Consultant

Employment month 1- 6
- Consultant will be paid at a guaranteed rate of $3000.00 per month or $1500.00 per pay period
- Commission of 10% is earned on commissionable sales from copying and blowback services and 5% is earned on commissionable sales from imaging, electronic discovery, and forensic services in excess of $30,000.00 per month

Employment month 7 forward
- Consultant will be paid a $2000.00 per month draw or $1000.00 per pay period
- Commission of 10% is earned on commissionable sales from copying and blowback services and 5% is earned on commissionable sales from imaging, electronic discovery, and forensic services in excess of $20,000 per month
- In the event the consultant fails to reach the commission threshold of $20,000 per month in any given month, the shortfall must be made up in the following months before commissions are calculated and paid

Since commission earnings are paid prior to payment of invoices, all commissions and/or bonuses are considered payroll advances.  In the event monies are not collected according to LEX's policies, these payroll advances will be deducted from the next available payroll check.



2/2/04

January 15, 2003

EXHIBIT "A"

LEX Reprographics is pleased to offer you the position of Account Manager. This is a full-time position with a starting salary of $30,000 per annum plus a bonus of 2% of Scott Butlers Revenue above $150,000 and less than $200,000. The salary will be paid twice per month and any bonus will be paid once per month. All compensation will be paid according to LEX Reprographics' current pay schedule.

LEX, INC.                            EMPLOYEE

By: _____        _____

Name: __CHUCK PINDELL__              Name: __JAMES P. REGAN__

Date: ___8.01.02___                  Date: ___8/02/02___

-10-

**United States District Court**
**District of Columbia**

JAMES P. REGAN                                    *

           **Plaintiff**                           *

    **v.**                                            *       **CASE NO. 1:08-cv-00697**
                                                  **Judge Royce C. Lamberth**
LEX, INC.                                         *

           **Defendant**                          *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

### AFFIDAVIT OF KATHLEEN HUGHES

1.    I am a witness of lawful age, competent to testify to the matters related herein. The following is based on personal knowledge.

2.    I am the Chief Financial Officer for LEX, Inc. t/a LEX On Demand ("LEX"). As such, my duties and responsibilities include overseeing and administering LEX's payroll, including the payroll as it pertained to James Regan.

3.    Mr. Regan began working for LEX in August, 2002 as an Account Manager in the Washington D.C. office and executed an employment agreement on August 2, 2002 that contained the terms and conditions of his employment as an Account Manager.

4.    In March of 2003, Regan was promoted to the position of Sales Consultant. On March 7, 2003, Regan entered into an employment agreement with LEX that superseded the Account Manager Employment Agreement and contained the terms and conditions of his employment as a Sales Consultant and remained in effect from the date of execution to the date he left employment with LEX. A copy of that Agreement is attached hereto as Exhibit 1.

5.    Pursuant to the terms of the Sales Consultant Employment Agreement, Regan was to be paid $3,000.00 per month for the first six (6) months; i.e., until September, 2003. Following the expiration of this initial six (6) month term, Regan was paid entirely on a commission basis which included a $2,000.00 per month advance against commissions earned.

6.      Regan remained employed with LEX as Sales Consultant, pursuant to the terms of the Second Employment Agreement, until his resignation on June 13, 2007.

7.      After Regan left LEX, he contacted LEX complaining that he thought he had been paid less than he earned under the company's commission structure. Shortly thereafter, Regan and his attorney came to LEX to go through his commission payments. To my knowledge, Regan was unable to identify any shortfalls in what he was paid.

8.      As the result of the allegations in this lawsuit, LEX undertook further analysis of Regan's commission payments. Regan was paid everything to which he was entitled. As a result of inquiries I've made, and after analyzing paychecks, I've determined that Regan has been paid any and all compensation owed pursuant to the terms of the Sales Consultant Employment Agreement.

In accordance with 28 USC § 1746 I declare under penalty of perjury that the foregoing is true and correct.

___6-11-08___
Date

_____
Kathleen Hughes

2

**United States District Court**
**District of Columbia**

| | | |
|---|---|---|
| **JAMES P. REGAN** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CASE NO. 1:08-cv-00697** |
| | | **Judge Royce C. Lamberth** |
| **LEX, INC.** | * | |
| **Defendant** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## AFFIDAVIT OF LYNDA ANDERSON

1.      I am a witness of lawful age, competent to testify to the matters related herein. The following is based on personal knowledge.

2.      During the period of the time that James Regan was employed by LEX, Inc. ("LEX") as a Sales Consultant, I was employed as the Managing Partner of LEX's District of Columbia office.  As Managing Partner, I was responsible for managing the overall operation of the office and the performance of its sales force.  As a Sales Consultant, Mr. Regan was one of the employees who worked under me.

3.      Regan's primary duties as a sales consultant included soliciting new business, visiting existing customers, and delivering the product to the customers.  As a sales consultant, Regan had daily contact with customers for which he was responsible.  Through such customer contact, Regan developed personal relationships with persons who had purchasing responsibilities within the law firms with which he dealt.  These personal customer contacts are essential to LEX's business as it is these personal relationships that LEX relies on and needs to retain in order to maintain its business.  Generally, corporations and law firms have designated persons within the firm that are responsible for purchasing and determining litigation support

services which include paper discovery and electronic discovery services. Thus, these personal customer contacts are even more crucial in LEX's particular business as in every organization there are a limited number of potential clients.

4.      Regan traveled from one location to the next in order to make sales and sales contacts. Regan was required to, and did, spend more than eighty percent of his time outside the office employed in the above endeavors, or in the office in efforts that were in support of his outside sales activities. For instance, he was required to attend sales meetings within the office, complete the paperwork necessary to record and process the sales he made, monitor the progress of the work sold, and handle customer inquiries pertaining to the work sold.

5.      Regan set his own hours; however, to be most effective, Regan primarily needed to work between the hours of 9:00 a.m. and 5:00 p.m. because that was when his clients' businesses generally operated. Regan always carried a cell phone/PDA and was available twenty-four (24) hours per day in case his clients needed to contact him.

6.      The only type of work performed by Regan that might not be considered incidental or related to making outside sales was minimal and significantly less than twenty percent of the total hours worked each week by Regan.

In accordance with 28 USC § 1746 I declare under penalty of perjury that the foregoing is true and correct.

_6·13·08_____
Date

_____
Lynda Anderson

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**JAMES P. REGAN**                                           *

        **Plaintiff**                                     *

    **v.**                                                    *          **CASE NO. 1:08-cv-00697**
                                          **Judge Royce C. Lamberth**

**LEX, INC.**                                                *

        **Defendant**                                    *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>ORDER</u>

The Court has reviewed and considered Defendant LEX, Inc.'s Motion for Summary Judgment, its Memorandum of Points and Authorities in Support thereof, and any Opposition thereto. For the reasons set forth by the Court in the foregoing Memorandum, it is this _____ day of _____, 2008, by the United States District Court for the District of Columbia, HEREBY ORDERED:

    (1)     That Defendant LEX, Inc.'s Motion for Summary Judgment is GRANTED; and

    (2)     That Judgment is entered in favor of Defendant LEX, Inc. and against Plaintiff James P. Regan, with costs.

 

_____
Royce C. Lamberth
United States District Court Judge