UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES P. REGAN,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Plaintiff⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀C.A. No. 1:08-cv-00697
vs.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀RCL
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
LEX, INC.,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀Defendant.⠀⠀⠀)
_____)

PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

⠀⠀⠀⠀Plaintiff James P. Regan ("Mr. Regan"), through counsel, respectfully opposes Defendant's Motion for Summary Judgment.

BACKGROUND

⠀⠀⠀⠀Before Plaintiff had any opportunity for discovery, Defendant Lex, Inc. moved for summary judgment on most of the claims in the case. This included Plaintiff's Fair Labor Standards Act (FLSA) claim for unpaid overtime compensation, Plaintiff's related claim under District of Columbia law, Plaintiff's breach of contract claim for unpaid commissions, and Plaintiff's related claims, plead in the alternative, under District of Columbia and Maryland wage payment law.

DEFENDANT'S FACTUAL ASSERTIONS ARE DISPUTED

⠀⠀⠀⠀Defendant does not claim that its purported facts are undisputed. Defendant's Memorandum at 2-3. However, Plaintiff specifically disputes the following of Defendant's purported facts.

⠀⠀⠀⠀First paragraph. Defendant's Exhibit 1 was outdated, because the commission structure was changed in 2004 or 2005. Regan Declaration, Exhibit 2, ¶28. Plaintiff did not resign from

Defendant, but was terminated in or about July 2007. Regan Declaration, Exhibit 2, ¶2.

Second paragraph. Plaintiff was paid a combination of salary and commission. Regan Declaration, Exhibit 2, ¶28.

Third paragraph. Plaintiff never came to Lex to go through his commission payments. Regan Declaration, Exhibit 2, ¶44. Plaintiff has identified many shortfalls in commissions he is due. Regan Declaration, Exhibit 2, ¶¶31-42.

Fourth paragraph. Plaintiff has identified many shortfalls in commissions he is due. Regan Declaration, Exhibit 2, ¶¶31-42.

Fifth paragraph. Plaintiff was required to and did spend most of his time in the office. Regan Declaration, Exhibit 2, ¶¶7-9, 17. Plaintiff's primary duty was providing production type services to clients. Regan Declaration, Exhibit 2, ¶¶5, 12-13. Plaintiff's was not allowed to sell to customers in Maryland or Virginia and was only allowed to sell to a select few customers in the District of Columbia. Regan Declaration, Exhibit 2, ¶14.

<u>PLAINTIFF IS NOT COVERED BY THE OUTSIDE SALES EXEMPTION</u>

Defendant asks the Court to find that Plaintiff is covered by the outside sales exemption from FLSA overtime requirements (and the related exemption in District of Columbia law). Defendant's Memorandum at 4-8. Defendant asks the Court to do this based on only a short (i.e., two pages) and extremely conclusory Declaration from Lynda Anderson.

This is wholly insufficient. Exemptions from FLSA requirements are to be narrowly construed and limited to those

"plainly and unmistakably within their terms and spirit." <u>Arnold v. Ben Kanowsky, Inc.</u>, 361 U.S. 388, 392 (1960). The employer has the burden of proving that an employee falls within an FLSA exemption. <u>Idaho Sheet Metal Works, Inc. v. Wirtz</u>, 383 U.S. 190, 206 (1966); <u>Corning Glass Works v. Brennan</u>, 417 U.S. 188, 196-97 (1974). The employer must establish by clear and convincing evidence that all the necessary elements of any claimed exemption have been met. <u>Shockley v. City of Newport News</u>, 997 F.2d 18, 21-22 (4th Cir. 1993). As shown more fully below, Defendant has failed in its burden, and there clearly are many disputed issues of material fact.

Defendant moves for summary judgment on the FLSA (and D.C. law) exemption issue, in spite of never pleading such an exemption as an affirmative defense in its Answer. <u>See</u> Defendant's Answer, Document 2. A claim of an FLSA exemption is an affirmative defense that is waived if not pleaded by the Defendant. <u>Magana v. Northern Mariana Islands</u>, 107 F.3d 1436, 1446 (9th Cir. 1997).

<u>ABUNDANT DISPUTED ISSUES OF MATERIAL FACT</u>

Key issues of fact concerning Plaintiff's job duties are hotly disputed. To qualify for the outside sales exemption, Defendant must prove that Plaintiff's primary duty was to make sales and that Plaintiff was customarily and regularly engaged away from their employer's place or places of business. <u>See, e.g.</u>, <u>McLaughlin v. Murphy</u>, 436 F. Supp.2d 732, 737 (D. Md. 2005).

First, there is a significant dispute over Plaintiff's primary duty. Plaintiff and a co-worker, Daniel Cogar, both testified that

3

Plaintiff's primary duty was not sales, but production type work, on which he spent the vast majority of his time. Cogar Declaration, Exhibit 1, ¶¶7-9, 15-16; Regan Declaration, Exhibit 2, ¶¶5-6, 12-13. As such, he could not qualify for the outside sales exemption. Cusmano v. Maquipan International, Inc., 2005 U.S. Dist. LEXIS 30257 (M.D. Fla. 2005).

Second, there is an even bigger dispute over whether the limited sales work that Plaintiff performed was performed outside of the office. Plaintiff and Mr. Cogar testified that almost all of the limited sales work took place in the office, not outside of the office. Regan Declaration, Exhibit 2, ¶¶10, 14-15; Cogar Declaration, Exhibit 1, ¶¶13, 17-18. Even if Plaintiff engaged in sales as his primary duty, he would not be under the outside sales exemption unless that sales activity was regularly engaged in away from the office. McLaughlin v. Murphy, 436 F. Supp.2d 732, 737 (D. Md. 2005); Casas v. Conseco Finance Corp., 2002 U.S. Dist. LEXIS 5775 (D. Minn. 2002); Billingslea v. Brayson Homes, Inc., 2006 U.S. Dist. LEXIS 11707 (N.D. Ga. 2006); Belton v. Premium Mortgage, Inc., 11 Wage & Hour Cas.2d (BNA) 503 (W. D. Mo. 2006); Reich v. Chicago Title Ins. Co., 853 F. Supp. 1325, 1332 (D. Kan. 1994).

### DISPUTED ISSUES OF FACT CONCERNING UNPAID COMMISSIONS

Defendant moves for summary judgment on the breach of contract claim (and the related wage payment statute claims) and relies exclusively on a short (i.e., eight paragraph) Declaration by Kathleen Hughes. Defendant's Document 4-5. Ms. Hughes simply states that: "Regan was paid everything to which he was entitled.

As a result of inquiries I've made and after analyzing paychecks, I've determined that Regan has been paid any and all compensation owed pursuant to the terms of the Sales Consultant Employment Agreement." Id. at ¶8.

Plaintiff provides extensive information on how he was underpaid on commissions, in breach of his employment contract. Regan Declaration, Exhibit 2, ¶¶27-46; Cogar Declaration, Exhibit 1, ¶¶25-37.  Plaintiff was systemically underpaid commissions as a result of how Defendant operated its "bad debt" policy.  Cogar Declaration, Exhibit 1, ¶¶28-37; Regan Declaration, Exhibit 2, ¶¶31-46; Exhibit 10.  Defendant's policy was to reduce commissions if a client payment was not received by day 120.  Regan Declaration, Exhibit 2, ¶¶29-30; Cogar Declaration, Exhibit 1, ¶¶26-27.  However, Defendant would delay logging in payments received by day 120, until after day 120.  Regan Declaration, Exhibit 2, ¶39.  Defendant would also place revenue received in an unapplied account and not credit it to any particular work.  Regan Declaration, Exhibit 2, ¶40.  Defendant also handled the "bad debt" in a way that amounted to double counting and reduced commissions far more than the official policy would reduce them.  Cogar Declaration, Exhibit 1, ¶31; Regan Declaration, Exhibit 2, ¶34; Exhibit 10.

Chuck Pindell, a former Vice President of Defendant, admitted to Plaintiff, when both were still employed by Defendant, that Defendant owed Plaintiff at least $80,000 in unpaid commissions, because Defendant had not calculated Plaintiff's commissions

correctly.  Regan Declaration, Exhibit 2, ¶¶37-38.  Mr. Pindell also admitted, in sworn testimony at Plaintiff's unemployment compensation hearing, that Defendant engaged in practices that decreased Plaintiff's commissions.  Regan Declaration, Exhibit 2, ¶¶41-42, 49; Exhibit 12, pp. 80-85.

Similarly, three high management officials of Defendant, the President, a Vice President, and the CFO, all admitted to Daniel Cogar that Mr. Cogar was owed thousands of dollars in unpaid commissions, because Defendant had not calculated Mr. Cogar's commissions correctly.  Cogar Declaration, Exhibit 1, ¶¶34-37.  Defendant paid Mr. Cogar $12,000 because of the prior underpayment of commissions, but Mr. Cogar believes that he is still due more money, and former Vice President Chuck Pindell admitted to Mr. Cogar that Mr. Cogar was due more money.  Cogar Declaration, Exhibit 1, ¶¶36-37.  Plaintiff is due money for commissions for the same reasons that Mr. Cogar was.  Cogar Declaration, Exhibit 1, ¶¶28-33.

If allowed discovery, Plaintiff will be able to provide more evidence and supporting documentation concerning the unpaid commissions.  See Regan Declaration, Exhibit 2, ¶¶37-46.

<u>NEED FOR DISCOVERY UNDER RULE 56(F)</u>

Defendant moved for summary judgment before Plaintiff had any opportunity for discovery.  This has prejudiced Plaintiff.  While Plaintiff has done his best to obtain affidavits and other evidence to show disputed issues of material fact, Plaintiff needs discovery.

Thus, Plaintiff requests that, if the Court cannot deny Defendant's Motion for Summary Judgment based on the existing record, that the Court order a continuance to permit discovery to be had. Fed. R. Civ. P. 56(f). Plaintiff will separately file a Motion under Rule 56(f) making such a request.

Summary judgment is proper only after the non-movant has had adequate discovery. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986) (party must have "a full opportunity to conduct discovery"); First Chicago International v. United Exchange Co., 267 U.S. App. D.C. 27, 836 F.2d 1375, 1380 (D.C. Cir. 1988) (reversal of summary judgment because some discovery requests still outstanding); Black v. NFL Players Ass'n, 87 F. Supp.2d 1, 3-4 (D. D.C. 2000) (defer ruling on motion for summary judgment until chance to take depositions and other discovery); 11 Moore's Federal Practice §56.10[8][a] (3d ed. 2000).

Concerning the claim for unpaid commissions, Plaintiff needs to take the deposition of Chuck Pindell, a former Vice President of Defendant, Lex, Inc. Mr. Pindell, admitted to Plaintiff, when both were still employed by Defendant, that Defendant owed Plaintiff at least $80,000 in unpaid commissions, because Defendant had not calculated Plaintiff's commissions correctly. Regan Declaration, Exhibit 2, ¶¶37-38. Mr. Pindell also admitted, in sworn testimony at Plaintiff's unemployment compensation hearing, that Defendant engaged in practices that decreased Plaintiff's commissions. Regan Declaration, Exhibit 2, ¶¶41-42, 49; Exhibit 12, pp. 80-85.

Plaintiff also needs document production of documents concerning all of the invoices that reflected his work and all documents showing the date and amount of payment of those invoices, as well as all documents concerning the alleged "bad debt" that reduced his commissions. Regan Declaration, Exhibit 2, ¶47.

For the FLSA exemption issue, Plaintiff need documents concerning his job duties, including the amount of time he spent on various duties, during his employment with Lex. Regan Declaration, Exhibit 2, ¶48. Plaintiff will seek such documents during discovery.

<u>CONCLUSION</u>

Plaintiff respectfully requests that the Court deny Defendant's Motion for Summary Judgment. Defendant has not met its heavy burden of proof for proving an FLSA exemption, particularly at the summary judgment stage. Defendant even failed to plead the affirmative defense of FLSA exemption. There are an abundance of disputed issues of material facts concerning Mr. Regan's job duties.

Plaintiff also showed that there are disputed issues of material fact concerning the breach of contract claim (and the related wage payment statute claims). Plaintiff and Mr. Cogar presented testimony that Defendant systemically underpaid Plaintiff on commissions. Plaintiff testified that Chuck Pindell, a Vice President of Defendant, admitted that Plaintiff was due a substantial amount of unpaid commissions.

Respectfully submitted,

 /s/ John J. Rigby
John J. Rigby, #255539
McInroy & Rigby, L.L.P.
2200 Wilson Blvd., Suite 800
Arlington, Virginia 22201
(703) 841-1100
(703) 841-1161 (fax)
jrigby@mcinroyrigby.com
Counsel for Plaintiff
James P. Regan

CERTIFICATE OF SERVICE

I hereby certify that, on August 21, 2008, I caused the foregoing to be electronically filed with he Clerk of the Court using the CM/ECF system which will send notifications of each filing to the following counsel of record.

Francis R. Laws, Esq.
Thomas & Libowitz, P.A.
100 Light Street, Suite 1100
Baltimore, Maryland 21202-1053
flaws@tandllaw.com
Counsel for Defendant

                                     /s/ John J. Rigby
                                   John J. Rigby, #255539
                                   McInroy & Rigby, L.L.P.
                                   2200 Wilson Blvd., Suite 800
                                   Arlington, Virginia 22201
                                   (703) 841-1100
                                   (703) 841-1161 (fax)
                                   jrigby@mcinroyrigby.com
                                   Counsel for Plaintiff
                                   James P. Regan

10

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES P. REGAN,                          )
                                         )
                Plaintiff                )
                                         )    C.A. No. 1:08-cv-00697
vs.                                      )    RCL
                                         )
LEX, INC.,                               )
                                         )
                Defendant.               )
_____  )

## DECLARATION OF DANIEL W. COGAR

    1.    I am over 21 years of age and am competent to testify to the matters set forth herein.  I have personal knowledge of the facts set forth herein.

    2.    I was employed by Lex, Inc., which did business as Lex On Demand, from approximately in or about late June, 2005 until on or about October 9, 2007.

    3.    Lex, Inc. performed copying services and other litigation support services for law firms and related work for other businesses.

    4.    When I was first hired, I assisted James Regan and Steven Mole.

    5.    I was promoted to sales consultant and then to Senior Consultant.  I performed the same work that James Regan performed.

    6.    I was familiar with the work performed by James Regan and the hours worked by James Regan.

    7.    My primary duties as a Senior Consultant were to provide help with the copying and other production type work that Lex, Inc. performed for law firms and related businesses.



8.   I spent the vast majority of my time on the production type work, rather than on sales work.

9.   James Regan also spent the vast majority of his time on the production type work, rather than on sales work.

10.   I performed the vast majority of my work in the office of Lex, Inc.  James Regan did the same.

11.   Some days I would be in the office the entire day, as would James Regan.

12.   I estimate that I spent between 65 and 70 percent of my time in the office.   James Regan spent approximately the same amount of time in the office.

13.   Most of the time that I spent outside of the office I spent on pickups and deliveries of work products.   It was the same with James Regan.

14.   I estimate that I spent 20 to 25 percent of my time on pickups and deliveries.

15.   Lynda Anderson, the Managing Partner of Lex, Inc., told sales consultants on more than one occasion that Lex management referred to sales consultants as being nothing than glorified project managers.  This was evident by management's attitude toward us during training sessions, business seminars, and general conversations with management officials.

16.   Lynda Anderson told sales consultants on more than one occasion that Lex management referred to sales consultants as farmers not hunters.   I understood this to mean that the sales

consultants just serviced clients, rather than performing sales work.

17.  My contact with clients was primarily by telephone and e-mail.  It was the same with James Regan.

18.  Sales presentations generally took place in Lex, Inc.'s office, not at the client's office.

19.  I worked much more than 40 hours a week when I was employed by Lex, Inc.  James Regan did the same.

20.  The sales consultants, including James Regan, were required to be in the office by 9:00 a.m., with the starting time changed to 8:30 a.m.  I and James Regan typically stayed in the office until 7:00 p.m. or 8:00 p.m.  Sometimes, we stayed as late as 1:00 a.m., working on projects.

21.  The sales consultants, like James Regan, were not allowed to work their own hours.  Instead, their arrival and departure times were strictly observed and regulated.

22.  Lynda Anderson, the Managing Partner, sent a January 12, 2006 e-mail to the sales consultants stating: "Just like your parole officer, please say hello to me in the mornings and good night to me when you leave.  Starting time is 9 AM, remember?"

23.  Lynda Anderson sent an e-mail to "DC Sales" personnel, including me, on July 6, 2006, with the subject heading "Arrival Time at 9 AM."  The e-mail stated: "Once again a reminder that your arrival time is 9 AM.  If you are late or detained for any reason, a phone call or email is in order to me.  As of today, I have sent individual(s) home that did not arrive by 9 AM.  If you have

3

vacation days and personal days they will be applied to your involuntary day off. If the issue remains chronic, the days will occur without pay.

24. On January 31, 2007, Scott Butler, the Director of Business Development, sent me, James Regan, and others an e-mail with the subject "New Start Time For Sales Consultants." The e-mail stated: Starting February 1, 2007 the new start time for sales consultants is 8:30AM. If you are going to be late please let me know by e-mail the night before."

25. Lex, Inc. paid sales consultants, like me and James Regan, commissions on the revenues collected for projects on which we worked.

26. The normal commission was eight percent of "sold revenue." However, the revenue eligible for commission was reduced for so-called bad debt, which was considered by Lex, Inc. to be any invoice not paid within 120 days. When the invoice was not paid by the 120th day, the amount owed went against the consultant's current monthly "sold revenue."

27. Under Lex, Inc.'s policy, if an invoice was paid within 150 days, we received 75 percent repay of the commission. If the invoice was paid within 180 days, we received 50 percent repay of the commission. If the invoice was paid within one year, we were paid 25 percent repay of the commission. If the invoice was paid beyond one year, we were repaid nothing.

28.  However, Lex, Inc. operated its "bad debt" policy in such a way that sales consultants, like me and James Regan, were systematically underpaid commissions.

29.  I pointed out the systemic problems with how Lex, Inc. calculated and paid commissions to management.

30.  For example, I pointed out the systemic problems in my July 11, 2007 e-mail to Kathleen Hughes and Eric Counts.

31.  Briefly, for "bad debt" (i.e, late payments on invoices), Lex, Inc. would both reduce the percentage paid and have a "bad debt" carryover that would operate to reduce commissions further. This was a kind of double counting for "bad debt." It reduced commissions far more than the official policy would reduce them.

32.  The way Lex, Inc. calculated commissions when there was "bad debt" would reduce commissions for employees who had worked on projects where the law firm in question paid the invoice more than 120 days after it was issued.

33.  I know that James Regan worked on projects that were paid late. Thus, James Regan was systematically underpaid commissions like I was.

34.  Dave Tomaschefski, President of Lex, Inc., Chuck Pindell, a Vice President of Lex, Inc., and Kathleen Hughes, the CFO of Lex, Inc., acknowledged that Lex, Inc. owed me money for commissions that were not calculated correctly.

35.  After I refused an initial offer of $5,000, Chuck Pindell helped to arrange for me to be paid $12,000 to cover some of the commissions that I did not receive that I should have received.

5

36.  I believe that I am still due more than the $12,000 that I was paid.

37.  Chuck Pindell has since told me that I am owed more commissions by Lex, Inc. than I have been paid, even with the extra $12,000 that Lex, Inc. paid me.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _7/30/08_

Daniel W. Cogar

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JAMES P. REGAN,                    )
                                   )
                Plaintiff          )
                                   )    C.A. No. 1:08-cv-00697
vs.                                )    RCL
                                   )
LEX, INC.,                         )
                                   )
                Defendant.         )
_____)

## DECLARATION OF JAMES P. REGAN

    1.   I am over 21 years of age and am competent to testify to the matters set forth herein. I have personal knowledge of the facts set forth herein.

    2.   I was employed by Lex, Inc., which did business as Lex On Demand, from approximately on or about July 28, 2002 until on or about July 2, 2007, when Lex terminated me.

    3.   Lex, Inc. performed copying services and other litigation support services for law firms and related work for other businesses.

    4.   I served as a Senior Consultant. I performed the same work that Daniel Cogar performed, after he was promoted to Senior Consultant.

    5.   My primary duties as a Senior Consultant were to provide help with the copying and other production type work that Lex, Inc. performed for law firms and related businesses.

    6.   I spent the vast majority of my time on the production type work, rather than on sales work.



EXHIBIT
2

7.    I performed the vast majority of my work in the office of Lex, Inc.

8.    Some days I would be in the office the entire day.

9.    I estimate that I spent approximately 80 percent of my time in the office.

10.    Most of the time that I spent outside of the office I spent on pickups and deliveries of work products.

11.    I estimate that I spent at least 15 percent of my time on pickups and deliveries.

12.    Lynda Anderson, the Managing Partner of Lex, Inc., on multiple occasions, referred to sales consultants at Lex as being nothing than glorified project managers.

13.    Lynda Anderson, on multiple occasions, referred to sales consultants as farmers not hunters.  I understood this to mean that the sales consultants just serviced clients, rather than performing sales work.

14.    My contact with clients was primarily by telephone and e-mail.  I was not allowed to sell any services to firms located in either Maryland or Virginia.  I was only allowed to sell services to a few assigned firms in the District of Columbia.

15.    Sales presentations almost always took place in Lex, Inc.'s office, not at the client's office.

16.    I worked much more than 40 hours a week when I was employed by Lex, Inc.

17.    The sales consultants, including me, were required to be in the office by 9:00 a.m., with the starting time changed to 8:30

2

a.m.  I typically stayed in the office until 7:00 p.m. or 8:00 p.m. Sometimes, I stayed in the office all night, working on projects. On more than one occasion, I stayed in the office more than 48 hours straight, working on projects.

18.  I was not allowed to work my own hours.  Instead, my arrival and departure times were strictly observed and regulated.

19.  Lynda Anderson, the Managing Partner, sent a January 12, 2006 e-mail to the sales consultants stating: "Just like your parole officer, please say hello to me in the mornings and good night to me when you leave.  Starting time is 9 AM, remember?" This document is attached as Exhibit 3.

20.  On January 31, 2007, Scott Butler, the Director of Business Development, sent me and others an e-mail with the subject "New Start Time For Sales Consultants."  The e-mail stated: Starting February 1, 2007 the new start time for sales consultants is 8:30AM.  If you are going to be late please let me know by e-mail the night before."  This document is attached as Exhibit 4.

21.  I was issued a Discipline Documentation Form by Lex, Inc. stating that: "Mr. Jamie Regan has repeatedly arrived at work after the official office start time of 9:00 a.m.  In a 2/23/07, Sales Consultant Meeting, Scott Butler reiterated the office policy that requires all sales consultants to be at their desk by 9:00 a.m." The documents also stated: "Mr. Regan was given a verbal warning and counseled that if the chronic tardiness continued, further disciplinary steps wold be taken, up to and including termination." This document is attached as Exhibit 5.

3

22.   Lynda Anderson of Lex, Inc. sent me an e-mail on March 14, 2007 stating "Jamie, Your tardiness appears to becoming a chronic issue.  If you are unable to arrive by 9:00 AM on Thursday, March 15th, the day will automatically be charged against your vacation time.  Although you are following policy on contacting Scott for your delayed arrivals, your frequent tardiness causes disruption to the work day and it is not in compliance with our policies.   Upon your arrival today, please see me and Linda Goldstein and be aware that this tardiness will be considered for disciplinary action."  This document is attached as Exhibit 6.

23.   Chuck Pindell, a Vice President of Lex, Inc., prepared a justification for my termination by Lex, Inc. that focused on my not arriving at the office by 9:00 a.m. Mr. Pindell stated this in an August 29, 2007 e-mail to Joe Gapp, that Lex, Inc. produced under subpoena by Lex, Inc., when it challenged my application for unemployment compensation. This document is attached as Exhibit 7.

24.   Chuck  Pindell,  in  another  justification  for  my termination by Lex, Inc. also justified my termination by Lex, Inc. as my not arriving at the office by 8:30 a.m.  Mr. Pindell stated this in an August 27, 2007 e-mail to Patty Shadkhoo that was produced under subpoena by Lex, Inc., when it challenged my application for unemployment compensation.  This document is attached as Exhibit 8.

25.   I have seen a November 21, 2005 e-mail from Lynda Anderson to Daniel Cogar and Brendan Einhorn, which Mr. Cogar gave to me.  That e-mail reads, in part: "Each day that you are not here

4

prior to 9:00 AM, I will send you home without pay." That e-mail is consistent with the Lex, Inc. policy applied to sales consultants. This document is attached as Exhibit 9.

26. I received a copy of a July 6, 2006 e-mail from Lynda Anderson to "DC Sales." The e-mail states: "Once again a reminder that your arrival time is 9 AM. If you are late or detained for any reason, a phone call or email is in order to me. As of today, I have sent individual(s) home that did not arrive by 9 AM. If you have vacation days and personal days they will be applied to your involuntary day off. If the issue remains chronic, the days will occur without pay." The document is attached as Exhibit 11. The e-mail accurately states the policy of Lex, Inc.

27. Lex, Inc. paid sales consultants, like me, commissions on the revenues collected for projects on which we worked.

28. The normal commission was eight percent of "sold revenue." The document attached as part of an Exhibit to Defendant's Motion for Summary Judgment, labeled Document 4-4, Page 10 of 11 was outdated. The compensation policy was revised in either 2004 or early 2005. I was paid a combination of salary and commission when I was employed by Lex, Inc.

29. The revenue eligible for commission was reduced for so-called bad debt, which was considered by Lex, Inc. to be any invoice not paid within 120 days. When the invoice was not paid by the 120th day, the amount owed went against the consultant's current monthly "sold revenue."

30. Under Lex, Inc.'s policy, if an invoice was paid within 150 days, we received 75 percent repay of the commission. If the invoice was paid within 180 days, we received 50 percent repay of the commission. If the invoice was paid within one year, we were paid 25 percent repay of the commission. If the invoice was paid beyond one year, we were repaid nothing.

31. However, Lex, Inc. operated its "bad debt" policy in such a way that sales consultants, like me, were systematically underpaid commissions.

32. Daniel Cogar and I pointed out the systemic problems with how Lex, Inc. calculated and paid commissions to management.

33. Daniel Cogar explained the systemic problems in his July 11, 2007 e-mail to Kathleen Hughes and Eric Counts, which he provided to me. This document is attached as Exhibit 10.

34. As Mr. Cogar explained in his July 11, 2007 e-mail, for "bad debt" (i.e, late payments on invoices), Lex, Inc. would both reduce the percentage paid and have a "bad debt" carryover that would operate to reduce commissions further. This was a kind of double counting for "bad debt." It reduced commissions far more than the official policy would reduce them. Mr. Cogar's analysis is correct. As stated above, his e-mail is attached as part of Exhibit 10.

35. The way Lex, Inc. calculated commissions when there was "bad debt" would reduce commissions for employees who had worked on projects where the law firm in question paid the invoice more than 120 days after it was issued.

6

36.    I worked on projects that were paid late. Thus, I was systematically underpaid commissions like Daniel Cogar was.

37.    When I was still an employee of Lex, Inc., Chuck Pindell, a Vice President of Lex, Inc., admitted that I was due approximately $80,000 in unpaid commissions, because my commissions were not calculated correctly.

38.    I told Mr. Pindell that I thought that I was due even more than $80,000. Mr. Pindell stated that I may be right.

39.    Another way that Lex, Inc. deprived me of commissions to which I was due was to delay logging in a payment that was received by day 120, until after day 120. I am aware of instances when Lex, Inc. did this. For example, a check from Banner Witcoff was received on day 120. However, the check was not recorded as received until day 123. This resulted in my being charged with bad debt and losing commissions.

40.    Another way Lex, Inc. deprived me of commissions was placing revenue received in an unapplied account and not crediting it toward any particular work. An example of this was when approximately $800,000 was paid by Thelan Reid, but not allocated to any particular invoices. Instead it was recorded in an unapplied account. This resulted in my being charged with bad debt and losing commissions.

41.    Another way that Lex, Inc. deprived me of commissions to which I was due, was to back date invoices. This would result in work that was performed as late as mid-June, being included in an invoice which covered work performed in May, and dated on or about

7

June 1. For example, I recall a June 13, 2007 e-mail from a Lex, Inc. management official, which directed that work performed in June 2007 be included with work performed in May 2007. This would shorten the window for the client to pay the invoice by a time that would result in my getting my full commission.

42. Chuck Pindell admitted that Lex, Inc. engaged in this policy during his sworn testimony at the October 16, 2007 hearing held on Lex, Inc.'s challenge of my unemployment compensation application. Specifically, Mr. Pindell admitted that Lex, Inc. backdated invoices so that work ordered in February would have a January invoice date and that this would shorten the 120 day period.

43. I have asked Mr. Pindell if he would provide a sworn Declaration concerning the unpaid commissions due me and information concerning the amount of time I was required to be in the office and, in fact, was in the office. Mr. Pindell said that he would testify under subpoena, but would not provide a sworn Declaration voluntarily.

44. After my employment with Lex, Inc. was terminated, I never went to Lex, Inc., with or without an attorney, to go through my commission payments. I would need access to hundreds of documents and would need the services of a forensic accountant to identify all of the underpayments in commissions. However, above I identified the systemic problems that led to systemic underpayments in commissions.

8

45.    I also would need access to some of Lex, Inc.'s records, which were typically not available to employees such as me, to identify all of the underpayments in commissions.    During my employment with Lex, Inc., I was told by Chuck Pindell, when he was a Vice President of Lex, Inc., that Lex, Inc. kept three sets of books.    The first set of books was the NOVO system, and was kept on computer.    I was able to access this system during my employment with Lex, Inc.    The second set of books was the so-called Red Book. The Red Book was a management set of books, which was also kept on computer.    Chuck Pindell printed pages of the Red Book for me on occasion.    I noted that the revenue numbers in the Red Book were vastly different from the revenue numbers in the NOVO system. Chuck Pindell also told me that there was a third set of books, the so-called General Ledger, which was kept in David Tomashefski's office.    Mr. Pindell told me that the revenue numbers in the General Ledger were the "real numbers."    I never had access to the revenue numbers in the General Ledger.

46.    I believe that I had some documents concerning unpaid commissions in my office at the termination of my employment.    I was not given documents in my office after my employment was terminated.    I was not even given my personal property which was in my office at the time I was terminated.    I asked repeatedly for the return of my personal property.    I was eventually told that my personal property had been put in one or more boxes and then thrown away.

47.    I need document production from Lex, Inc. of documents concerning all of the invoices that reflected my work and all documents showing the date and amount of payment of those invoices, as well as all documents concerning the alleged "bad debt" that reduced my commissions.

48.    For the FLSA exemption issue, I need document production from Lex, Inc. of documents concerning my job duties, including the amount of time I spent on various duties, during my employment with Lex.

49.    Excerpts from the transcript of the hearing of Lex, Inc.'s challenge to my unemployment compensation are attached as Exhibit 12.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on: _8 . 19 . 08_

James P. Regan

## John Rigby

**From:**      "Lynda Anderson" <landerson@lexondemand.com>
**To:**        "DC Sales" <DCSales@lexondemand.com>
**Sent:**      Thursday, January 12, 2006 10:41 AM
**Subject:**   Good Mornings and Good Evenings

Just like your parole officer, please say hello to me in the mornings and good night to me when you leave.
Starting time is 9 AM, remember?

**Lynda Anderson |** Managing Partner
Lex Business Solutions
900 7th St. NW | Washington, DC  20001
(o) 202.289.1500



## John Rigby

| | |
|---|---|
| **From:** | "Scott Butler" <sbutler@lexondemand.com> |
| **To:** | "Daniel Cogar" <dcogar@lexondemand.com>; "Aaron Lund" <alund@lexondemand.com>; "Sarah Patthoff" <spatthoff@lexondemand.com>; "Stephen Mole" <smole@lexondemand.com>; "Jamie Regan" <jregan@lexondemand.com>; "Jason Kozak" <jkozak@lexondemand.com>; "Jaclyn Leffel" <jleffel@lexondemand.com> |
| **Sent:** | Wednesday, January 31, 2007 6:18 PM |
| **Attach:** | Scott Butler.vcf |
| **Subject:** | New Start Time For Sales Consultants |

Team,

Starting February 1, 2007 the new start for sales consultants is 8:30AM.
If you are going to be late please let me know by e-mail the night before.
Do not call Porsche.

Scott

**Scott Butler** I Director of Business Development
**L E X   O n   D e m a n d**
900 7th St. NW I Washington DC, 20001
(o) 202.289.1500  I (c) 301.675.9172

EXHIBIT
4



**BUSINESS SOLUTIONS**®

# Discipline Documentation Form

### Employee Information

Name of Employee: Jamie Regan

Employee's Job Title:  Sales Consultant

### Incident Information

**Date/Time of Incident**: 3/14/07; 9:42 a.m.

**Location of Incident**:  D.C. Office

### Description of Incident:

*Mr. Jamie Regan has repeatedly arrived at work after the official office start time of 9:00 a.m. In a 2/23/2007, Sales Consultant Meeting, Scott Butler reiterated the office policy that requires all sales consultants to be at their desk by 9:00 a.m.  Since March 1, Mr. Regan has e-mailed Mr. Butler five times noting that he was running behind and would not be in the office by 9:00 a.m.  The dates are as follows:  3/1, 3/5, 3/7, 3/13 and 3/14. On 3/14, Lynda Anderson, Managing Director of the Office, e-mailed Mr. Regan that his chronic tardiness would not be tolerated and he would be considered for disciplinary action.*

**Witnesses to Incident**:  *Scott Butler, Director of Business Development*

**Was this incident in violation of a company policy?**                    ***Yes***

**If yes, specify which policy and how the incident violated it.**

> *Employee Handbook-Policy 207-Hours of Work*

> *"Your particular hours of work and the scheduling of your meal period will be determined and assigned by your manager or department head."*

### Action Taken

**What action will be taken against the employee?**

*Mr. Regan was given a verbal warning and counseled that if the chronic tardiness continued, further disciplinary steps would be taken, up to and including termination.*



EXHIBIT
5

**Has the impropriety of the employee's actions been explained to the employee?  Yes**

Lynda Anderson and Scott Butler spoke with Mr. Regan on 3/19/07. _this did not occur._ JR

**Did the employee offer any explanation for the conduct?  If so, what was it?**

I have contacted Mr. Butler on these dates ranging from being in traffic to going to calls from clients that needed me there before arriving into the office. Also I have spent numerous nights here to late hours of the night and the following day. I was following policy of contacting Mr. Butler before 9 a.m.

Signature of person
Preparing report: _[signature]_

Date: 3·28·07.

Signature of
employee _[signature]_

Date _3/26/07_

3/26/07
Scott Butler e-mailed this form to Jamie
Regan on 3/26/07 since Jamie did
not acknowledge receipt of e-mails from
Mr. Butler requesting a meeting.

lmg

3-28-07.
- Jamie cites late hours at night.
- I have been here past 7:00 pm each
  night and I would have taken
  notice of the late night activity and allowed
  him flexibility
_[signature]_

# Linda Goldstein

| | |
|---|---|
| **From:** | Scott Butler |
| **Sent:** | Tuesday, March 27, 2007 4:50 PM |
| **To:** | Linda Goldstein |
| **Subject:** | FW: Have you followed up on this email |

*3/27*

*Jamie was on vacation 3/15, at client site 3/16. Returned to office on 3/19.*

*1mg*

---

**From:** Scott Butler
**Sent:** Tuesday, March 20, 2007 10:25 AM
**To:** Jamie Regan
**Subject:** Have you followed-up on this email

Jamie,

This email was sent to you on Wednesday, March 14, 2007.
Please see Linda Goldstein or Me about this.

Scott

**Scott Butler | Director of Business Development**
**LEX On Demand**
900 7th St. NW | Washington DC, 20001
(o) 202.289.1500 | (c) 301.675.9172


Jamie,

Your tardiness appears to becoming a chronic issue.  If you are unable to arrive by 9:00 AM on
Thursday, March 15th, the day will automatically be charged against your vacation time.
Although you are following policy on contacting Scott for your delayed arrivals, your frequent
tardiness causes disruption to the work day and it is not in compliance with our policies.
Upon your arrival today, please see me and Linda Goldstein and be aware that this tardiness
will be considered for disciplinary action.

Thank you,
Lynda

Number of emails sent to Scott Butler each morning stating tardiness since March 1st (10
business days):  Five

Lynda Anderson | Managing Partner
Lex  On  Demand
900 7th St. NW | Washington, DC  20001
(o) 202.289.1500


EXHIBIT
6

**Patty Shadkhoo**

| | |
|---|---|
| **From:** | Chuck D. Pindell [cpindell@lexondemand.com] |
| **Sent:** | Wednesday, August 29, 2007 2:50 PM |
| **To:** | Joe Gapp |
| **Cc:** | Patty Shadkhoo |
| **Subject:** | RE: James Regan |

In Dec 2006 Lynda Anderson and Scott Butler sat with him with a verbal counsel on his tardiness

On February 23, Jamie Regan singed a document stating he understood our Tardiness policy that he need to be in the office by 9:00 am every morning.

In February 2007 I personally told him that if he could come to work on time everyday at 9:00 am - I would pay for his parking ($250.00 per month)- that lasted a week and he started coming in at 10:00.

On February 26, Jamie emailed his immediate supervisor saying he was sorry about the jeans he had on but he had gotten in late the night before from North Carolina (vacation) and did not realize he did not have a dress shirt or shoes for work - he was late to work this day.

On March 1st, at 8:57 am Jamie emailed his immediate supervisor stating that he would be late again.

On March 5th, Jamie emailed his immediate supervisor at 8:50 stating he was running late

On March 7th, Jamie emailed his immediate supervisor at 8:58 am stating is was still on the road and running late

On March 13th Jamie emailed his immediate supervisor stating he was at Dulles airport waiting for a friend that was flying in for his birthday and he would be running late into the office

On March 14th Jamie emailed his immediate supervisor that is was running behind schedule and would be late

On March 14th Jamie was not responsive to any Mgmt and an email was sent to Jamie asking to come to the office - for a written Disciplinary Documentation meeting.  Jamie never acknowledged or responded.

On May 9th - Jamie did not show up to work, nor did he call at the requested time following out policies - He finally emailed his immediate supervisor at 11:12 am stating he was not feeling well and would not be in.

I spoke with Jamie on Tuesday, June 12 in a meeting with his immediate supervisors and I told him that I could not handle his tardiness and his lack of salesmanship for revenue - I told him that if it continues I would have to terminate him - he agreed and said he would probably resign before I terminated him -

His behavior and tardiness disrupted the office and we agreed it was time for him to leave the DC office.

During that conversation, he stated his unhappiness working in the DC office - I then offered to send him to our corporate office and do his current job but from corporate instead of DC - He said he would think out it - I gave him until Friday, June 15th - and asked him to call me directly

June 15th he responded that he declined my offer.

Chuck Pindell
Vice President / Business Development
LEX On Demand

1



EXHIBIT
7

1912 Woodford Road
Vienna, Virginia  22182
office: (703) 245-6100
fax: (202) 289-3809
direct: (202) 494-5990
www.lexondemand.com

CONFIDENTIAL NOTICE:  This message from LEX On Demand contains information which is
privileged and confidential and is solely for the use of the intended recipient.  If you
are not the intended recipient, be aware that any review, disclosure, copying,
distribution, or use of the contents of this message is prohibited.  If you have received
this in error, please destroy it immediately and notify us by replying to this email or
calling 703.245.6100.

-----Original Message-----
From: Joe Gapp [mailto:Jgapp@consultechclaim.com]
Sent: Wednesday, August 29, 2007 2:22 PM
To: Chuck D. Pindell
Subject: FW: James Regan

In order to protest this claim, I need the specifics of the final incident that led to his
discharge with date. I also need to know the dates of the verbal warnings.


PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

Joe Gapp
(518) 689-2470 x21
(518) 689-0227 fax

jgapp@consultechclaim.com
www.consultechclaim.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential
and is intended only for the review of the party to whom it is addressed. If you have
received this transmission in error, please immediately return it to the sender.
Unintended transmission shall not constitute waiver of the attorney-client or any other
privilege.


-----Original Message-----
From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
Sent: Wednesday, August 29, 2007 2:14 PM
To: Joe Gapp
Cc: 'Chuck D. Pindell'
Subject: RE: James Regan

You can email him

-----Original Message-----
From: Joe Gapp [mailto:Jgapp@consultechclaim.com]
Sent: Wednesday, August 29, 2007 2:02 PM
To: Patty Shadkhoo
Subject: RE: James Regan

This one I got. However, additional info is needed by Chuck. Do you want me to e-mail him?


PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

Joe Gapp
(518) 689-2470 x21
(518) 689-0227 fax

jgapp@consultechclaim.com
www.consultechclaim.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential
and is intended only for the review of the party to whom it is addressed. If you have
received this transmission in error, please immediately return it to the sender.
Unintended transmission shall not constitute waiver of the attorney-client or any other
privilege.


-----Original Message-----
From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
Sent: Wednesday, August 29, 2007 1:53 PM
To: Joe Gapp
Subject: RE: James Regan

I forwarded information pertaining to you regarding this from Chuck.  If that information
will not suffice than we have nothing to stand on.

-----Original Message-----
From: Joe Gapp [mailto:Jgapp@consultechclaim.com]
Sent: Wednesday, August 29, 2007 12:11 PM
To: Patty Shadkhoo
Subject: RE: James Regan

This is due today otherwise we lose our hearing rights.


PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

Joe Gapp
(518) 689-2470 x21
(518) 689-0227 fax

jgapp@consultechclaim.com
www.consultechclaim.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential
and is intended only for the review of the party to whom it is addressed. If you have
received this transmission in error, please immediately return it to the sender.
Unintended transmission shall not constitute waiver of the attorney-client or any other
privilege.


-----Original Message-----
From: Joe Gapp
Sent: Monday, August 27, 2007 12:13 PM
To: 'Patty Shadkhoo'
Subject: RE: James Regan

I need the specifics of the final incident that led to the discharge with date.
I also need the dates of the verbal warnings, and by whom? Who discharged him?


PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

Joe Gapp
(518) 689-2470 x21
(518) 689-0227 fax

jgapp@consultechclaim.com
www.consultechclaim.com

Confidentiality Notice: This electronic mail transmission is privileged and confidential and is intended only for the review of the party to whom it is addressed. If you have received this transmission in error, please immediately return it to the sender. Unintended transmission shall not constitute waiver of the attorney-client or any other privilege.

-----Original Message-----
From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
Sent: Monday, August 27, 2007 11:28 AM
To: Joe Gapp
Subject: FW: James Regan


-----Original Message-----
From: Chuck D. Pindell [mailto:cpindell@lexondemand.com]
Sent: Monday, August 27, 2007 10:26 AM
To: Patty Shadkhoo
Subject: RE: James Regan

Jamie had many verbal counseling on his arrival to work. He could not make
it to work by the time of 9:00 every morning - his revnue had declined over
$100K per month and he was never around to be found. We offer him to come to
the corporate office and take a regional position (promotion) and he declined.

call me if you need more info

        -----Original Message-----
        From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
        Sent: Mon 8/27/2007 10:02 AM
        To: Chuck D. Pindell
        Cc:
        Subject: FW: James Regan


        Have not heard back from you regarding this.


        From: Joe Gapp [mailto:Jgapp@consultechclaim.com]
        Sent: Friday, August 24, 2007 9:35 AM
        To: Patty Shadkhoo
        Subject: RE: James Regan


        This does not constitute a refusal as it would have been a change in
terms and conditions of employment, Is there any evidence of misconduct
based on his performance? Or is it he could no do the job up to company
standards?

PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

```
Joe Gapp
(518) 689-2470 x21
(518) 689-0227 fax
```

jgapp@consultechclaim.com <mailto:jgapp@consultechclaim.com>
www.consultechclaim.com <http://www.consultechclaim.com>

        Confidentiality Notice: This electronic mail transmission is
privileged and confidential and is intended only for the review of the
party
to whom it is addressed. If you have received this transmission in
error,
please immediately return it to the sender. Unintended transmission
shall
not constitute waiver of the attorney-client or any other privilege.


        -----Original Message-----
        From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
        Sent: Thursday, August 23, 2007 1:12 PM
        To: Joe Gapp
        Subject: RE: James Regan




        From: Joe Gapp [mailto:Jgapp@consultechclaim.com]
        Sent: Thursday, August 23, 2007 12:12 PM
        To: pshadkhoo@lasership.com
        Subject: James Regan


        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

        WORKED:   LEX - DC

        DOH: 07/29/2002
        LDW: 06/13/2007
        REASON:performance - offered to moved to corporate and he
declined
offer- sales person in dc and wasn't performing dc and he was offered
regional sales in va corporate and declined
        POSITION:consultant
        DUE:   8/29/07




        PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

        Joe Gapp
        (518) 689-2470 x21
        (518) 689-0227 fax

        jgapp@consultechclaim.com <mailto:jgapp@consultechclaim.com>
```

www.consultechclaim.com <http://www.consultechclaim.com>

Confidentiality Notice: This electronic mail transmission is
privileged and confidential and is intended only for the review of the
party
to whom it is addressed. If you have received this transmission in
error,
please immediately return it to the sender. Unintended transmission
shall
not constitute waiver of the attorney-client or any other privilege.

**Patty Shadkhoo**

| | |
|---|---|
| **From:** | Chuck D. Pindell [cpindell@lexondemand.com] |
| **Sent:** | Monday, August 27, 2007 2:38 PM |
| **To:** | Patty Shadkhoo |
| **Subject:** | RE: James Regan |

In Dec 2006 Lynda Anderson and Scott Butler sat with him with a verbal counsel on his tardiness

In February 2007 I personally told him that if he could come to work on time everyday at 8:30 – I would pay for his parking – that lasted a week and he started coming in at 10:00 – stating that he was at a clients office – he brought with him now jobs from the client office nor did he come to our office to deliver something to a client

I spoke with him on Tuesday, June 12 in a meeting with his immediate supervisors and I – I told him that I could not handle his tardiness and his lack of salesmanship for revenue – I told him that if it continues I would have to terminate him – he agreed and said he would probably resign also –

His behavior disrupted the office and we agreed it was time for him to leave the DC office.

During that conversation, he stated his unhappiness working in the DC office – I then offered to send him to our corporate office and do his current job but from there – He said he would think out it – I gave him until Friday, June 15th –

June 15th he responded that he declined my offer.

Chuck Pindell
Vice President / Business Development
LEX On Demand
1912 Woodford Road
Vienna, Virginia 22182
office: (703) 245-6100
fax: (202) 289-3809
direct: (202) 494-5990
www.lexondemand.com

CONFIDENTIAL NOTICE: This message from LEX On Demand contains information which is privileged and confidential and is solely for the use of the intended recipient. If you are not the intended recipient, be aware that any review, disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this in error, please destroy it immediately and notify us by replying to this email or calling 703.245.6100.
-----Original Message-----
From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
Sent: Monday, August 27, 2007 12:27 PM
To: Chuck D. Pindell
Subject: FW: James Regan


-----Original Message-----
From: Joe Gapp [mailto:Jgapp@consultechclaim.com]
Sent: Monday, August 27, 2007 12:13 PM
To: Patty Shadkhoo
Subject: RE: James Regan

I need the specifics of the final incident that led to the discharge with date.
I also need the dates of the verbal warnings, and by whom? Who discharged him?



EXHIBIT
8

1

PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

Joe Gapp
(518) 689-2470 x21
(518) 689-0227 fax

jgapp@consultechclaim.com
www.consultechclaim.com

Confidentiality Notice: This electronic mail transmission is privileged
and confidential and is intended only for the review of the party to
whom it is addressed. If you have received this transmission in error,
please immediately return it to the sender. Unintended transmission
shall not constitute waiver of the attorney-client or any other
privilege.


-----Original Message-----
From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
Sent: Monday, August 27, 2007 11:28 AM
To: Joe Gapp
Subject: FW: James Regan


-----Original Message-----
From: Chuck D. Pindell [mailto:cpindell@lexondemand.com]
Sent: Monday, August 27, 2007 10:26 AM
To: Patty Shadkhoo
Subject: RE: James Regan

Jamie had many verbal counseling on his arrival to work. He could not
make
it to work by the time of 9:00 every morning - his revnue had declined
over
$100K per month and he was never around to be found. We offer him to
come to
the corporate office and take a regional position (promotion) and he
declined.

call me if you need more info

        -----Original Message-----
        From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
        Sent: Mon 8/27/2007 10:02 AM
        To: Chuck D. Pindell
        Cc:
        Subject: FW: James Regan


    Have not heard back from you regarding this.


        From: Joe Gapp [mailto:Jgapp@consultechclaim.com]
        Sent: Friday, August 24, 2007 9:35 AM
        To: Patty Shadkhoo
        Subject: RE: James Regan

This does not constitute a refusal as it would have been a change in
terms and conditions of employment, Is there any evidence of misconduct
based on his performance? Or is it he could no do the job up to company
standards?

PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

Joe Gapp
(518) 689-2470 x21
(518) 689-0227 fax

jgapp@consultechclaim.com <mailto:jgapp@consultechclaim.com>
www.consultechclaim.com <http://www.consultechclaim.com>

Confidentiality Notice: This electronic mail transmission is
privileged and confidential and is intended only for the review of the party
to whom it is addressed. If you have received this transmission in error,
please immediately return it to the sender. Unintended transmission shall
not constitute waiver of the attorney-client or any other privilege.

-----Original Message-----
From: Patty Shadkhoo [mailto:pshadkhoo@lasership.com]
Sent: Thursday, August 23, 2007 1:12 PM
To: Joe Gapp
Subject: RE: James Regan

From: Joe Gapp [mailto:Jgapp@consultechclaim.com]
Sent: Thursday, August 23, 2007 12:12 PM
To: pshadkhoo@lasership.com
Subject: James Regan

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

WORKED:   LEX - DC

DOH: 07/29/2002
LDW: 06/13/2007
REASON:performance - offered to moved to corporate and he declined
offer- sales person in dc and wasn't performing dc and he was offered
regional sales in va corporate and declined
POSITION:consultant
DUE:   8/29/07

PLEASE NOTE MY NEW PHONE EXTENSION AND FAX NUMBER!!!!

Joe Gapp
(518) 689-2470 x21
(518) 689-0227 fax

jgapp@consultechclaim.com <mailto:jgapp@consultechclaim.com>
www.consultechclaim.com <http://www.consultechclaim.com>

Confidentiality Notice: This electronic mail transmission is
privileged and confidential and is intended only for the review of the
party
to whom it is addressed. If you have received this transmission in
error,
please immediately return it to the sender. Unintended transmission
shall
not constitute waiver of the attorney-client or any other privilege.

## John Rigby

| | |
|---|---|
| **From:** | "Lynda Anderson" <landerson@lexondemand.com> |
| **To:** | "Daniel Cogar" <dcogar@lexondemand.com>; "Brendan Einhorn" <beinhorn@lexondemand.com> |
| **Sent:** | Monday, November 21, 2005 10:29 AM |
| **Subject:** | It's 9:28 on Monday morning and where are you? |

Good Morning Gentlemen,

Each day that you are not here prior to 9:00 AM, I will send you home without pay.
I will also assign your accounts to people that can be here on time, for example, Adam, Aaron and Sarah.

Sorry.  You have been forewarned.  And, this warning has occurred more times than necessary and in various diplomatic and professional gestures.
Please do not mess with me.   It will not be very pretty.

Brendan:  I had a sales meeting on Friday afternoon and you were not there.  Please see me.

Thank you.

**Lynda Anderson** | Managing Partner
L e x  B u s i n e s s  S o l u t i o n s
900 7th St. NW | Washington, DC  20001
(o) 202.289.1500

EXHIBIT

9

**John Rigby**



| | |
|---|---|
| **From:** | "Daniel Cogar" <dcogar@lexondemand.com> |
| **To:** | "Chuck D. Pindell" <cpindell@lexondemand.com> |
| **Cc:** | "Robert J. Draper" <rdraper@lexondemand.com> |
| **Sent:** | Monday, July 30, 2007 2:07 PM |
| **Subject:** | FW: My Commission |

Chuck,

I am forwarding you the email chain I sent to better focus the investigation of my commissionable revenue. I have highlighted topic areas and key sections in red as I do not feel those subjects were addressed sufficiently in the email you read to me. The "8% commission" topic is not under Kathleen's jurisdiction as I understand it. Please assist me in having the rate adjusted or direct me to the person with whom I should address this matter. Additionally, please verify that the payment I do receive pursuant to adjustments made is the amount I would have received June 1st before additional bad debt, brokerage, deficit, etc. from June or July was applied. I appreciate all your help and ask that you please continue to stay involved as it has already taken a month in our attempts to resolve my payment issues (I assume these corrections need to be expedited further due to the fact that it is already the 30th).

Thanks again,

Dan

**Daniel W. Cogar**
Senior Consultant | LEX On Demand
o: 202.289.1500 | c: 703.474.5575 | f: 202.289.0099

CONFIDENTIAL NOTICE: This message from LEX On Demand contains information which is privileged and confidential and is solely for the use of the intended recipient. If you are not the intended recipient, be aware that any review, disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this in error, please destroy it immediately and notify us by replying to this email or calling 202-289-1500.

**From:** Daniel Cogar
**Sent:** Monday, July 16, 2007 4:46 PM
**To:** Kathleen Hughes; Eric Counts
**Cc:** Robert J. Draper
**Subject:** RE: My Commission

Good afternoon,

I was wondering if there was any new information regarding this issue with my commission. Please let me know any new status when you have the opportunity.

Thank you,

Dan

**Daniel W. Cogar**
Senior Consultant | LEX On Demand
o: 202.289.1500 | c: 703.474.5575 | f: 202.289.0099

CONFIDENTIAL NOTICE: This message from LEX On Demand contains information which is privileged and confidential and is solely for the use of the intended recipient. If you are not the intended recipient, be aware that any review, disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have

received this in error, please destroy it immediately and notify us by replying to this email or calling 202-289-1500.

**From:** Daniel Cogar
**Sent:** Wednesday, July 11, 2007 7:09 PM
**To:** Kathleen Hughes; Eric Counts
**Subject:** My Commission

Kathleen and Eric,

Thank you for taking the time to reevaluate my commissions. When reviewing the necessary figures, please address the following key topic areas:

- Revenue deficit – after the Dechert invoices were voided out and reissued in May, my revenue for 3 months or so fell below the commissionable level. This resulted in revenue deficit which has rolled into my year to date deficit.

- Bad Debt – invoices were issued, I was paid, I was hit on bad debt so I'm back at zero. The client then paid the full amount and I receive the appropriate percentage of the revenue per the sliding scale. However, Lex reduced the invoices due to a litany of problems that occurred. Therefore I lost the full amount that I had been paid but then only had the opportunity to regain a portion of the original revenue. The difference left over stays on my statement as bad debt, which is not fair. For example, I got paid on ~$166,000 of Detroit Diesel revenue and then got hit on all of it. Since then they paid us the full amount that was owed. However, we had reduced the bill to ~$141,000 so even though we're all paid up I am left with ~$15,000 of bad debt left over. Also, my understanding was that if I get hit on $100,000 of bad debt and then the client pays the $100,000 back, then I should no longer have any bad debt. I realize that I get a reduced payout on the repay, but I don't see why I should still carry a bad debt balance if the invoice is paid in full. I get paid on the commissionable value of the revenue, then lose that same value, then get repaid %75 of the value if repaid between 121 and 150 days. However, my revenue shouldn't carry a negative balance of 25% from the transaction, but perhaps I do not fully understand our policy.

- New Revenue – The newly issued invoice for ~$261,000 was issued to Detroit Diesel, but applies to jobs previously billed to Dechert. We issued invoices for ~$500,000 but only ~$200,000 worth of invoices was actually signed off on; we later had to issue a large credit on the ~$500,000 total. I got paid on the invoices that were signed and then got hit on all the bad debt so I am back at zero. These invoices were all voided in May, but we knew we would be giving a discount of at least $200,000 back in January. If the invoices had been voided then, there would have been no bad debt. As it stands, the invoices were voided leaving me no paid commission due to the bad debt that was already applied. I believe I should be paid on the ~$261,000 as I would have on new revenue since it is a new invoice and there are endless extenuating circumstances that created this situation, none of them my fault. On top of that, if you subtract the ~$200,000 that was signed for, there is still ~$60,000 of new revenue that was never signed off on and should be applied now. However, even in that scenario it is unfair to set aside the ~$200,000 in signed revenue and take the entire discounted amount from the 2007 revenue when the discount was given due to errant processing that spanned both December and January. The fact that all invoices from December through April were voided with a reduced amount being re-invoiced makes it seem that the only just way to deal with it is to treat as new revenue.

- 8% Commission – when Dechert signed on to this project, it was decided that I was to only receive 2% on the Dechert revenue. I obviously did not agree with this but the decision was made and I did my job as I always would (despite the fact that there were never any changes made to my compensation plan). Keeping in line with the reissued Dechert invoices under one Detroit Diesel invoice, I firmly believe I deserve the full commission percentage for all the work I have done on this project. While I realize she is not the decision maker, Lynda Anderson can attest to the amount I have put into this case and whether I deserve the change or not; I only mention this because I feel that her recommendation may carry more weight then my own opinion. Those who I was formerly sharing my commission with no longer work for this company and were a major part of things going sour in the first place. I have gone above and beyond anything asked of a consultant regarding client consultation and relations, project management, coordination of outside vendors, collections, analysis and reporting, invoicing, production, and everything I thought necessary to assist the firm and corporate client.

I really appreciate both your help with this matter as it is obviously an extremely important issue for me. We've been paid for everything invoiced yet I'm still in the negative and that doesn't seem right or even possible. This is in addition to the fact that I have over $250,000 in non-Detroit/Dechert 2007 revenue and my other bad debt/brokerage does not exceed that amount. Whatever can be done to resolve the situation is greatly appreciated. Please let me know if there is anything whatsoever that I can do to aid in this process.

Thank you again,

Dan

**Daniel W. Cogar**
Senior Consultant | LEX On Demand
o: 202.289.1500 | c: 703.474.5575 | f: 202.289.0099

CONFIDENTIAL NOTICE: This message from LEX On Demand contains information which is privileged and confidential and is solely for the use of the intended recipient. If you are not the intended recipient, be aware that any review, disclosure, copying, distribution, or use of the contents of this message is prohibited. If you have received this in error, please destroy it immediately and notify us by replying to this email or calling 202-289-1500.

## John Rigby

**From:**     "Lynda Anderson" <landerson@lexondemand.com>
**To:**       "DC Sales" <DCSales@lexondemand.com>
**Cc:**       "Chuck D. Pindell" <cpindell@lexondemand.com>
**Sent:**     Thursday, July 06, 2006 10:41 AM
**Subject:**  Arrival Time at 9 AM

Good Morning DC Sales Team,

Once again a reminder that your arrival time is 9 AM.  If you are late or detained for any reason, a phone call or email is in order to me.  As of today, I have sent individual(s) home that did not arrive by 9 AM.  If you have vacation days and personal days they will be applied to your involuntary day off.  If the issue remains chronic, the days will occur without pay.

Thank you for your compliance.
Lynda

**Lynda Anderson** | Managing Partner
L e x  O n  D e m a n d
900 7th St. NW | Washington, DC  20001
(o) 202.289.1500

EXHIBIT

11

Page 1

1            DISTRICT OF COLUMBA

2        OFFICE OF ADMINISTRATIVE HEARINGS

3    ------------------------------x

4    JAMES P. REGAN,                    :

5            Appellant/Claimant,    :

6                                  : Case No

7                                  : ES-P-07-108425

8    LEX, INC.,                         :

9            Appellee/Employer.     :

10   ------------------------------x

11

12

13   Washington, D.C.

14            Tuesday, October 16, 2007

15        The HEARING in the above-captioned matter

16   was held pursuant to notice, at the Office of

17   Administrative Hearings, 941 North Capital Street,

18   N.E., Washington, D.C.  20002, Hearing Room 12,

19   commencing at 10:45 a.m., before the HONORABLE ANN C.

20   YAHNER.

21

22

EXHIBIT
12

James P. Regan v. Lex, Inc.
October 16, 2007

Page 42

1      A      Correct.

2      Q      And if you would, take a look on Exhibit

3   100, Section 1(D) about the assigned territory.

4      A      Yes, sir.

5      Q      And that territory was defined as D.C.,

6   Arlington, Fairfax, Loudon, Prince William,

7   Alexandria, Montgomery, Prince George's, Howard, and

8   Charles.   Correct?

9      A      Correct.

10      Q      And there's no similar territory in

11   Exhibit 103.   Correct?

12      A      Correct.

13      Q      And the scope of the geographic

14   description in Exhibit 103 was nationwide.   Am I

15   right?

16      A      Correct.

17      Q      And let me just return, just for a second,

18   to Exhibit 100.   Mr. Regan, when he was at Lex worked

19   exclusively in D.C.   Correct?

20      A      Correct.

21      Q      And in fact, he was prohibited from

22   selling in Virginia.   Is that correct?

1        A       That would be correct.

2        Q       And he was likewise prohibited from

3    selling in Maryland.  Isn't that correct?

4        A       That would be correct.

5        Q       And the restriction, if you turn back to

6    100 for just a second, and I'm looking now on Section

7    5, describe his primary duty as "shall be to assist

8    the company in becoming the best, most successful

9    copy services provider in employee's assigned

10   territory."  Is that correct?

11       A       That's correct.

12       Q       And that restriction or that description

13   of his primary duty never changed.  Isn't that

14   correct, Mr. Pindell?

15       A       Of his employment agreement, correct.

16       Q       Now, when you sent this--what's your e-

17   mail address?

18       A       cpindell@lexondemand.com.

19       Q       And that hasn't changed in the past year,

20   has it?

21       A       No, sir.

22       Q       When you sent your expression of

James P. Regan v. Lex, Inc.
October 16, 2007

Page 78

1    until he finishes his question because if you talk

2    over him the record won't be clear and he may not

3    necessarily be ending his question where you think he

4    is.

5            THE WITNESS:  Yes, Your Honor.

6            BY MR. INGLE:

7        Q       With respect to the incident you described

8    on March 13th, Mr. Pindell, in fact, the documents

9    that you produced show that Mr. Regan sent you an e-

10   mail saying that he was in Dulles waiting for a

11   friend that was flying in for his birthday.  Correct?

12       A       Correct.

13       Q       And another occasion on the 14th, he was

14   stuck.  There was an accident on 495 on the Beltway.

15   Correct?

16       A       Correct, which he notified our office

17   after 9 o'clock.

18       Q       When you met with Mr. Regan throughout

19   the--in the summer or even in the spring of 2007, had

20   he complained to you that he had not been fully

21   compensated.  He had not received those commissions.

22       Q       Yes.

James P. Regan v. Lex, Inc.
October 16, 2007

Page 79

1      A      And did he express his concern that

2    payments, which were being delivered from clients,

3    were not being fully credited.

4              THE COURT:  All right.  Relevance.

5              MR. INGLE:  I think it goes to the reason

6    Mr. Regan was complaining about the fact that he

7    wasn't being fully compensated and I think it goes to

8    the reason stated for the termination.  I also think

9    it goes to the reason why he was--seems to have been

10   micromanaged with respect to his attendance.

11             THE COURT:  I will allow you a few more

12   questions along this line, but we're not going to

13   spend a lot of time on it.

14             MR. INGLE:  Fair enough, Your Honor.

15             BY MR. INGLE:

16     Q      How were salesmen--is it correct to say

17   that, Mr. Pindell, that the bulk of their

18   compensation was commissions?

19     A      Yes.

20     Q      And can you explain the concept of the so-

21   call "bad debt" how that works if the client is late

22   paying.

James P. Regan v. Lex, Inc.
October 16, 2007

Page 80

1    A    Now or at that time?

2    Q    At that time--in the spring of 2007.

3    A    The consultant would perform the service

4    to a client of copy scanner electronic discovery.  We

5    would produce an invoice to the client.  Whatever the

6    sales consultant sold within that period of that

7    month they would be paid up front a commission based

8    on that revenue number.  So if they sold $100,000,

9    they would get a percentage of that up front.  If the

10   client did not pay the bill within 120, then we took

11   it back from them.  We took it off their current

12   month's revenue sales.  If the client then turned

13   around and paid it between 121 days and 150 days, we

14   give 75 percent of it back to the consultant.  If

15   it's 151 days to 180 days, it's 50 percent back to

16   the consultant.

17   Q    So the amount of the commission would be

18   reduced?

19   A    And then 181 days to 365 days, we pay 25

20   percent back to the consultant.

21   Q    And the way it's supposed to work is

22   whenever that payment eventually came in, whether it

James P. Regan v. Lex, Inc.
October 16, 2007

1    was Day 125 or Day 155, if it's $100,000--let's just

2    use a simple round number--that would be applied to

3    the so-called "bad debt" account to wipe off whatever

4    bad debt there was and then, in turn, he would be

5    compensated based upon that.  Isn't that the way it's

6    supposed to work?

7    A    When it's posted to our accounts.

8    Q    Whatever day that might be?

9    A    Yeah.

10   Q    Okay.  And Mr. Regan had complained that

11   he wasn't getting a full credit for the payments that

12   were coming in from the clients, even if they may

13   have come in after the Day 120.  Isn't that correct?

14   A    He did say that to me, yes.

15   Q    Okay.  And in fact, he was getting a

16   reduced--

17   A    Excuse me, sir.  I'm sorry.

18        THE COURT:  Wait.  You just need to answer

19   his questions.  If you want to add something, you can

20   do that when you testify again.  Can you put a

21   timeframe on these complaints as well in your next

22   questions, please?

Page 82

1              MR. INGLE:  Sure.

2              BY MR. INGLE:

3         Q      Let's just say for the 2007 timeframe,

4    okay, didn't he complaint to you about the fact that

5    when those payments would come in from a client, say,

6    it's $100,000 as a hypothetical, if it came in on Day

7    125, that that full $100,000 was not being applied to

8    the so-called "bad debt" ledger, if you will.

9         A      Yes.

10         Q      And didn't he also complain that the

11    company was going ahead and backdating invoices.  So

12    if work was--a client made an order in February, for

13    example, that the invoice would reflect a January

14    invoice date?

15         A      I don't recall that complaint.

16         Q      But is that, in fact, the practice, which

17    occurred?

18         A      Yes, it's a practice of ours.

19         Q      Okay.  And in effect, the result of that

20    would be to shrink the 120-day period, shorten it.

21         A      I'm not exactly sure how our CFO or

22    Accounting does all that figuring.  I'm not involved

James P. Regan v. Lex, Inc.
October 16, 2007

Page 83

1    in the comp plans or commissions.

2         Q         Okay.

3         A         But logically speaking, sir, listening to

4    you.

5         Q         And did Mr. Regan also complain about the

6    fact that payments that were being received from a

7    client were not being posted when they were received,

8    posted sometimes on a later date the net effect of

9    which would maybe push it past 120 days and therefore

10   reduce his commission?

11        A         I don't remember.  The conversations that

12   I had with him weren't complaints.  We were friends.

13   His complaints would go to his direct management, but

14   I do know that he has made those statements to me

15   that he has talked with his management about.

16        Q         Okay.  But let's not get hung up on the

17   word "complaint."  He raised that with you as a

18   concern.

19        A         Yes.

20        Q         And he raised all three of the things I

21   described--the fact that he wasn't getting full

22   credit for the payments that were coming in.

James P. Regan v. Lex, Inc.
October 16, 2007

Page 84

1    Correct?

2        A    Yes.

3        Q    That the invoices were being backdated.

4    Correct?

5        A    I don't remember him verbalizing it or

6    complaining it, but that is a practice.  We close our

7    month on the 5th day of the month and we push the

8    invoices that--the invoices that get dated on the end

9    of the month because productions come in on the last

10    day of the month.  We produce it.  It takes three or

11    four days to produce it.  We push those invoices for

12    the last day of the month because they're order dates

13    that go into our system--the days that come into the

14    system.

15        Q    And the third concern would be that the

16    payments, once they were actually received, were not

17    being applied in a timely fashion such that he wasn't

18    getting the full benefit of the commission.  Correct?

19        A    Yes.

20        Q    And yet despite those concerns that were

21    being raised, the company never provided Mr. Regan,

22    as he requested, with a list of his commission--the

James P. Regan v. Lex, Inc.
October 16, 2007

Page 85

1    accounts that he worked on and the commissions that

2    he otherwise would have received.   Correct?

3         A     No, Mr. Regan has access--each month he

4    gets a commission statement.   Mr. Regan has access,

5    through our proprietary software, to see when

6    payments arrive from his clients.   He can pull up

7    reports.   He can see revenue that he sold in certain

8    period months.   He can pull up revenue for the year.

9    He can pull up payments.   If he doesn't have access

10   to that, management within the office does.   They

11   could have AR reports that could show clearly any

12   question that he would have.

13        Q     Mr. Dan Kugard (phonetic) raised the same

14   objections, did he not?

15        A     Yes.

16        Q     And recently you personally delivered a

17   check to him for 8 to $12,000?

18        THE COURT:   Mr. Ingle, you're too far

19   afield right now.   What happened with another--I

20   assume another sale consultant is not relevant here.

21   You've established the fact that Mr. Regan complained

22   about certain issues.   You've got to move on.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


JAMES P. REGAN,                          )
                                         )
                Plaintiff                )
                                         )    C.A. No. 1:08-cv-00697
vs.                                      )    RCL
                                         )
LEX, INC.,                               )
                                         )
                Defendant.               )
_____  )


ORDER

UPON CONSIDERATION of Defendant's Motion for Summary Judgment,
Plaintiff's Opposition, and any Reply by Defendant, it is

ORDERED that Defendant's Motion for Summary Judgment is
DENIED.



_____
Royce C. Lamberth
United States District Court Judge